COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
NO.
2-01-272-CV
 
BEVERLY WINDSOR AND                                                              
        
APPELLANTS
MORGAN WINDSOR
V.
JOHN MAXWELL                                                              
                    
APPELLEE
 
------------
FROM THE 393
RD DISTRICT COURT OF DENTON
COUNTY
------------
OPINION
------------
This is an appeal from an order
granting John Maxwell, M.D.'s ("Dr. Maxwell") motion to dismiss the
medical malpractice lawsuit filed against him by appellants Beverly Windsor and
Morgan Windsor ("the Windsors"). The trial court dismissed the
Windsors' suit on the ground that they failed to provide an expert report
meeting the requirements of article 4590i, section 13.01(d) of the Texas Medical
Liability and Insurance Improvement Act ("the Act"). See Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(d) (Vernon
Supp. 2003). Because we conclude the trial court acted within its discretion in
dismissing the case, we will affirm.
Factual and
Procedural Background
On January 14, 1998 Beverly Windsor
underwent a cerebral arteriogram (also sometimes referred to as an angiogram), a
diagnostic procedure in which a catheter was inserted into her cerebral artery.
Dr. Maxwell, a neuro-radiologist, was Beverly Windsor's treating physician. The
Windsors alleged in their suit that Ms. Windsor suffered an injury caused by Dr.
Maxwell's negligence when he used a wrong sized catheter during the procedure
and when he failed to immediately withdraw the catheter at the onset of her
nausea and vomiting. An infarction injury (tissue death) allegedly occurred when
the catheter severed Ms. Windsor's cerebral artery and penetrated her brain. The
Windsors' specific complaints were that Dr. Maxwell was negligent in failing to
select an appropriate technique to perform the arteriogram, failing to obtain
Ms. Windsor's informed consent, failing to select an appropriate catheter,
improperly positioning the catheter, injecting the catheter through the cerebral
artery into her brain, failing to acknowledge and honor her withdrawal of
consent during the procedure, and failing to assure proper placement of the
catheter.
In connection with their claim, the
Windsors provided the report of Kendall M. Jones, M.D. ("Dr. Jones"),
a board-certified radiologist, pursuant to article 4590i, section 13.01(d) of
the Act. We will emphasize in bold those areas of the report we deem pertinent
to the causation question at issue in this appeal:

        
 The patient has suffered the complication of an intimal injury to the left
 vertebral artery origin during a cerebral angiogram on 1/14/98. A
 subsequent MRI confirms the presence of additional cerebellar infarction (in
 addition to previously seen postoperative or post-hemorrhagic changes) on the
 left corresponding to the left vertebral artery injury.
        
 . . . .
        
 [T]he post-angiography report states that "multiple catheter exchanges
 were made to access the left vertebral [artery]." However, the number of
 catheter exchanges is not given. The risk of vascular injury rises
 with each new attempt and with prolonged procedure time, particularly after
 one hour of catheter use. When the vertebral artery cannot be
 accessed, the subclavian artery can be safely injected.
        
 Finally, it was stated that the patient developed nausea and vomiting, and
 that the catheter was subsequently removed from the vertebral artery. The
 patient reports a delay in the removal of the catheter. Removal in such cases
 should be immediate, since nausea and vomiting are clear warnings of vertebral
 ischemia. The delay in removing the catheter is below the standard of care. In
 addition, the patient withdrew consent and requested termination of the
 procedure, and in this case the procedure should have been terminated
 immediately. The patient has reported that consent was withdrawn to the
 procedure and that the procedure continued despite such withdrawal of consent,
 with subsequent infarction documented above. The fact that the
 patient withdrew consent and the procedure continued with subsequent
 complications, is indicative that the actions by Dr. Maxwell did indeed fall
 below the standard of care.
        
 The appropriate standard of care for a cerebral angiogram would be to
 immediately remove a cerebral catheter at the onset of nausea and vomiting,
 which are indicative of vertebral ischemia. In addition, it is the standard of
 care to discontinue a procedure when the patient has verbally withdrawn
 consent. It is therefore, my opinion that Dr. Maxwell fell below the standard
 of care exercised by a reasonable and prudent radiologist in similar
 circumstances. [Emphasis added.]
  

At the conclusion of the hearing on
Dr. Maxwell's motion to dismiss, the trial court made the following statement in
connection with its order granting the motion: "Plaintiffs' Expert Report
failed to meet the requirements of Art. 4590i, § 13.01(r)(6) by failing to
provide the causal relationship between the alleged failure and the injury, harm
or damages claimed."
The Windsors present three issues
on appeal: (1) the trial court erred in granting Dr. Maxwell's motion to dismiss
on the basis that their expert report failed to provide the causal relationship
between the alleged failure and the injury; (2) the trial court abused its
discretion in granting Dr. Maxwell's motion to dismiss because the expert report
correctly informed Dr. Maxwell of the specific conduct the Windsors called into
question and because the report provided a basis to conclude the Windsors'
claims have merit; and (3) the trial court erred in granting the motion to
dismiss because there was sufficient evidence supporting the Windsors' claims of
assault and battery, which involved matters of common knowledge by laymen, thus
removing the requirement of compliance with any medical malpractice statute.
Expert Reports
Under The Act
We begin our analysis with a review
of the Act's requirements. Medical-malpractice plaintiffs must provide each
defendant physician and health care provider an expert report with the expert's
curriculum vitae. See Tex.
Rev. Civ. Stat. Ann. art. 4590i, § 13.01(d); Am.
Transitional Care Ctrs., Inc. v. Palacios, 46 S.W.3d 873, 877 (Tex. 2001).
The report must provide "a fair summary of the expert's opinions as of the
date of the report regarding applicable standards of care, the manner in which
the care rendered by the physician or health care provider failed to meet the
standards, and the causal relationship between that failure and the injury,
harm, or damages claimed." Tex.
Rev. Civ. Stat. Ann. art. 4590i, § 13.01(r)(6). If a plaintiff
timely files an expert report and the defendant moves to dismiss a claim because
of the report's inadequacy, the trial court must grant the motion "only if
it appears to the court, after hearing, that the report does not represent a
good faith effort to comply with the definition of an expert report in
subsection (r)(6) of this section." Id. § 13.01(l).
The supreme court analyzed these
statutory requirements in Palacios, 46 S.W.3d at 877-80. There the
court explained that, when considering a motion to dismiss under section 13.01(l),
"[t]he issue for the trial court is whether 'the report' represents a
good-faith effort to comply with the statutory definition of an expert
report." Id. at 878. To constitute a "good-faith
effort," the report must provide enough information to fulfill two
purposes: (1) it must inform the defendant of the specific conduct the plaintiff
has called into question; and (2) it must provide a basis for the trial court to
conclude that the claims have merit. Id. at 879.
The trial court should look no
further than the report itself, because all the information relevant to the
inquiry is contained within the document's four corners. Id. at 878.
The report need not marshal all the plaintiff's proof, but it must include the
expert's opinion on each of the three elements that the Act identifies: standard
of care, breach, and of critical import to the instant appeal, the causal
relationship. Id. A report cannot merely state the expert's conclusions
about these elements. Id. at 879. "[R]ather, the expert must
explain the basis of his statements to link his conclusions to the facts." Earle
v. Ratliff, 998 S.W.2d 882, 890 (Tex. 1999).
We review a trial court's order
dismissing a claim for failure to comply with section 13.01(d)'s expert-report
requirements under an abuse of discretion standard. Palacios, 46 S.W.3d
at 878. A trial court abuses its discretion if it acts in an arbitrary or
unreasonable manner without reference to any guiding rules or principles. Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985), cert.
denied, 476 U.S. 1159 (1986). When reviewing matters committed to the trial
court's discretion, a court of appeals may not substitute its own judgment for
the trial court's judgment. See Flores v. Fourth Court of Appeals, 777
S.W.2d 38, 41 (Tex. 1989)(orig. proceeding).
The Challenge To
The Windsors' Report
Dr. Maxwell did not dispute that
the expert report fairly summarized the alleged standard of care. See Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(r)(6). Nor did
he dispute that the report fairly summarized how he allegedly breached the
standard of care. See id. Dr. Maxwell only contested in the trial court
whether the report fairly summarized the causal relationship between his alleged
breach and Ms. Windsor's injury. See id.; Palacios,
46 S.W.3d at 879.
Citing the supreme court's recent
decision in Bowie Memorial Hospital v. Wright, 79 S.W.3d 48 (Tex.
2002), Dr. Maxwell contends that the trial court acted within its direction in
determining that the report failed to reflect the causal link required by the
Act.
In Wright, the plaintiff
suffered fractures in her right knee and foot in a car accident and sued for
damages when the Bowie Memorial Hospital physician's assistant who took her
x-rays either misplaced or misread the foot x-ray and, therefore, did not
discover the fracture in the right foot. Id. at 50. The fracture was
discovered a month later and required the plaintiff to undergo two surgeries
over ten months. Id. The plaintiff complained that if the physician's
assistant had diagnosed her fractured foot earlier she "probably would have
had a better outcome." Id. at 51. To establish a causal
relationship between her breach of the standard of care and her injury, the
plaintiff relied on one statement in her expert report: "if the x-rays
would have been correctly read and the appropriate medical personnel acted upon
those findings then [plaintiff] would have had the possibility of a better
outcome." Id. at 52-53. The plaintiff contended that this
statement "explains why [plaintiff's] damages were caused by [defendant's]
breach." Id. at 53.
The supreme court held that the
report's conclusory statement that the plaintiff might have had "the
possibility of a better outcome" did not constitute a good faith effort to
comply with the statute's causation requirement because it did not provide
information linking the expert's conclusion that the plaintiff might have had a
better outcome to the defendant's failure to correctly read and act upon the
x-rays, i.e., the report failed to explain how the defendant's conduct caused
further injury to the plaintiff. Id. The court viewed the report as
conclusory and held "[a] conclusory report does not meet the Act's
requirements, because it does not satisfy the Palacios test." Id.
No Causal Link
Between The Injury And The
Alleged Use Of A Wrong Sized Catheter
The Windsors claim in their
pleadings that Dr. Maxwell was negligent in failing to select an appropriate
sized catheter for the arteriogram procedure. Nothing in Dr. Jones' report
indicates the catheters used in the procedure were of an inappropriate size or
that the size selection in any manner caused Ms. Windsor's injury. Dr. Jones
merely noted that "multiple catheter exchanges were made" and that the
"risk of vascular injury rises with each new attempt and with prolonged
procedure time." Dr. Jones also noted that he was unaware of the number of
catheter exchanges made during the procedure. Lacking any connection between the
intimal injury and the Windsors' pleaded cause of action alleging use of a wrong
sized catheter, we cannot say the trial court abused its discretion in granting
Dr. Maxwell's motion. See Wright, 79 S.W.3d at 53.
No Causal Link
Between The Injury And The Alleged
Failure To Timely Withdraw The Catheter
In addition to claiming Dr. Maxwell
used an inappropriate sized catheter, the Windsors also alleged in their
pleadings that Dr. Maxwell used an improper "technique" during the
arteriogram and that he breached the requisite standard of care when he
continued with the procedure after Ms. Windsor withdrew consent.
Dr. Jones stated in his report that
arterial injuries, including intimal injury, are known complications of cerebral
angiography, but he never set forth in the report a causal connection between
the technique chosen by Dr. Maxwell, his failure to discontinue the procedure
immediately upon Ms. Windsor's request, and the intimal injury she suffered. The
Texas Supreme Court has stated that the report's adequacy does not depend on
whether the expert uses any particular "magical words." Wright,
79 S.W.3d at 53. It is sufficient that the report contains information
summarizing and explaining the causal relationship between the doctor's failure
to meet the applicable standards of care and the plaintiff's injury. Id. Here,
however, the closest Dr. Jones came to voicing an opinion on the issue of
causation is contained in one sentence of the report: "[t]he patient has
reported that consent was withdrawn to the procedure and that the procedure
continued despite such withdrawal of consent, with subsequent infarction
documented above."
We believe there are at least two
reasons why the trial court, in its discretion, could have properly concluded
this sentence was insufficient to explain the requisite casual connection
between the injury and Dr. Maxwell's conduct. First, it is not clear from the
final clause of the sentence that Dr. Jones was even attempting to insinuate
that he believed a casual connection existed between the failure of Dr. Maxwell
to immediately end the arteriogram and the intimal brain injury. The sentence
can reasonably be read as only relating that Ms. Windsor had
"reported" two things to Dr. Jones: (1) she withdrew consent during
the procedure; and (2) the procedure continued, with subsequent infarction
(tissue death). In other words, the sentence could reasonably be interpreted as
intending to mean only "the patient told me that she withdrew consent and
told me that the infarction occurred after Dr. Maxwell refused to honor that
request." Under this interpretation, it cannot be inferred from the report
that Dr. Jones or Ms. Windsor believed the injury was caused by Dr. Maxwell's
failure to immediately withdraw the catheter. A mere statement by the patient
that her injury followed the withdrawal of consent does not suffice to establish
the explanation of causation requirement for reports under the Act. See
Ratliff, 998 S.W.2d at 890 (noting the expert must explain the basis of
"his statements" linking "his conclusions" to the facts).(1)
The dissent apparently
misunderstands the import of this analysis. We do not mean to suggest that when
drafting the report a plaintiff's medical expert cannot make logical inferences
from statements made to the expert by the plaintiff or that the plaintiff must
"prove a fact"-here that the infarction occurred after withdrawal of
consent; only that the Act requires that the causal connection in the
report be set forth and explained by the expert doctor. In other words, a report
would not be sufficient under the Act if, on the question of causation, the
doctor merely stated "the patient told me that the defendant physician
caused her injury," because the Act requires an explanation linking the
basis of the expert's conclusions to the facts. See Ratliff,
998 S.W.2d at 890. Nor would a report be sufficient if it merely states, as
related here, that the injury followed the act. Here, evidence that the
infarction occurred after the catheter remained in the artery does not establish
that maintaining the catheter in the artery caused the artery to be
pierced, much less explain that causation, as required by the Act.(2)
To the extent the sentence might
alternatively be read to infer that what Dr. Jones was really attempting to
articulate is a conclusion that there existed a casual connection between the
injury and the failure to immediately cease the procedure following withdrawal
of consent, we must honor the Texas Supreme Court's directive that trial court
orders granting dismissals under the Act be reviewed under an abuse of
discretion standard, under which reviewing courts are not to interpret the
report in the light most favorable to the nonmovant (here, the Windsors), but
instead look to whether the trial court acted in an unreasonable manner without
reference to any guiding rules or principles. Wright, 79 S.W.3d at
52-53; see also Palacios, 46 S.W.3d at 877 (directing reviewing courts not
to indulge in reasonable inferences in favor of the nonmovant). Therefore, even
if a reasonable inference might be drawn that Dr. Jones was really attempting to
articulate in the sentence in question a conclusion on causation, we do not hold
the trial court acted unreasonably and without reference to any guiding
principles in failing to draw that inference.
Even had the trial court inferred
from the report that Dr. Jones believed Ms. Windsor's intimal injury was caused
by Dr. Maxwell's failure to end the procedure upon withdrawal of her consent,
Dr. Jones' statement "[t]he patient has reported that consent was withdrawn
to the procedure and that the procedure continued despite such withdrawal of
consent, with subsequent infarction documented above[,]" at best, amounts
to only a mere conclusion on causation because it does not explain how
continuance of the procedure caused the infarction. In order for his report to
establish the requisite casual link, Dr. Jones was required to explain, in some
manner, how the failure to immediately withdraw the catheter caused the injury. See
Wright, 79 S.W.3d at 52. A conclusory report does not meet the Act's
requirements, because it does not satisfy the Palacios test. Id.
(citing Palacios, 46 S.W.3d at 879). We therefore hold the trial court
acted within its discretion in dismissing the Windsors' claim.(3)
The dissent concludes that Dr.
Jones' report was sufficient to establish a causal link between Dr. Maxwell's
conduct and a general injury to the cerebellum caused by "reduced blood
flow through the artery being catheterized." One problem with this
conclusion is that the Windsors have not alleged a general injury caused by
reduced blood flow through the artery being catheterized. Instead, the Windsors
allege that Ms. Windsor's brain infarction injury was caused when Dr. Maxwell,
using a wrong sized catheter, "pierced her cerebral artery with the
catheter during the procedure" and that he "forced the catheter too
far severing the cerebral artery" and entering her brain.(4)
Another problem with the dissent's analysis is that even if the Windsors had
pleaded the injury the dissent believes was described in Dr. Jones' report, the
report does not explain, in any manner, a causal link between Dr. Maxwell's
conduct and the injury.
The dissent's belief that the
expert report need not support the specific theory of negligence alleged in a
plaintiff's written pleadings is based on a misinterpretation of the language in
Palacios providing that "the only information relevant to the
[trial court's] inquiry is within the four corners of the document." Palacios,
46 S.W.3d at 878. That statement was made by the Texas Supreme Court in
connection with its analysis of an argument that the trial court should be
required to look to other evidence outside the report in the event it concludes
the report does not provide the fair summary required under the Act, an idea the
court squarely rejected. The court clearly did not mean to suggest by this
language that the trial court was required to ignore the plaintiff's pleadings
when conducting its review of the doctor's report, particularly in light of the
court's subsequent notation in Palacios that "the report must
inform the defendant of the specific conduct the plaintiff has called into
question." Id. at 879. To inform the defendant of the specific
conduct the plaintiff has called into question, the report must support the
cause of action alleged by the plaintiff in its pleadings. To hold otherwise
would lead to easily imagined absurd results. Issues one and two are overruled.
The Windsors'
Remaining Theories Of Negligence
To the extent that the Windsors'
remaining pleaded acts of negligence (failure to use an appropriate technique,
improperly positioning the catheter, improper penetration of the catheter, and
failure to assure proper placement of the catheter) constitute theories of
negligence outside the theories discussed above, the trial court's dismissal for
non-compliance with the Act's causation explanation is wholly supported. Nowhere
in the expert report tendered by the Windsors are those theories of negligence
addressed.
We do not reach the merits of the
Windsors' argument in issue three that an assault and battery claim need not be
supported by an expert report under the Act because, as correctly noted by Dr.
Maxwell on appeal, the Windsors did not plead a cause of action for assault and
battery. Issue three is overruled and the trial court's judgment is affirmed.
 
                                                                      
DAVID L. RICHARDS
                                                                      
JUSTICE
 
PANEL A: HOLMAN AND WALKER, JJ.;
and DAVID L. RICHARDS, J. (Sitting by Assignment).
               
WALKER, J. filed a dissenting opinion.
DELIVERED: August 27, 2003

 
COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
NO. 2-01-272-CV
 
BEVERLY WINDSOR
AND                                                                       
APPELLANTS
MORGAN WINDSOR
V.
JOHN MAXWELL                                                                                   
APPELLEE
 
------------
FROM THE 393RD
DISTRICT COURT OF DENTON COUNTY
------------
DISSENTING
OPINION
------------
I. Introduction
I respectfully dissent. The
analytical framework utilized by the majority is contrary to the plain language
of article 4590i, section 13.01(l) and ignores controlling supreme
court case law. I believe that Dr. Jones's report, properly examined against the
benchmark, guiding principles of good faith--that the report contain information
sufficient to apprise the defendant of the claims against him and to permit the
trial court to conclude the claims have merit--is clearly adequate.(1) Consequently, I would hold that the trial court
abused its discretion by dismissing the Windsors' health care liability claim
against Dr. Maxwell and would reverse the trial court's order of dismissal.
II. An Expert
Report Need not Correlate to Pleaded
Acts of Negligence to Constitute a Good Faith Effort
The Windsors pleaded:
Cause of Action

        
 Defendants [sic] failed to meet the minimum standard of care and provided
 substandard medical care and was negligent to Plaintiffs [sic] as follows:
 
        
 (A) failing to select an appropriate technique to perform the arteriogram
 and failing to obtain an informed consent;
        
 (B) failing to select an appropriate catheter;
        
 (C) improperly positioning the catheter;
        
 (D) injecting the catheter through the cerebral artery into plaintiff's
 brain;
        
 (E) failing to acknowledge and honor the plaintiff's withdrawal of her
 consent; and
        
 (F) failing to assure proper placement of the catheter;
 
 Each of the above stated
 negligent acts was the direct and proximate cause of Plaintiff's damages.

The majority, instead of looking to
the four corners of Dr. Jones's report to determine whether it constitutes a
good faith effort at compliance with article 4590i, section 13.01(r)(6)'s
definition of an expert report, inexplicably, sua sponte, juxtaposes the
Windsors' pleaded acts of negligence with Dr. Jones's report. Cf. Bowie
Mem'l Hosp. v. Wright, 79 S.W.3d 48, 53 (Tex. 2002) (explaining, "We
have held that the only information relevant to whether a report represents a
good-faith effort to comply with the statutory requirements is the report
itself."); Am. Transitional Care Ctrs., Inc. v. Palacios, 46
S.W.3d 873, 878 (Tex. 2001) (interpreting the statute as requiring courts to
look only to the report to determine adequacy--"Because the statute focuses
on what the report discusses, the only information relevant to the inquiry is
within the four corners of the document."). The majority looks to specific
negligent acts pleaded by the Windsors and then reviews Dr. Jones's report to
see if the Windsors have come forward with a causation opinion from Dr. Jones on
the pleaded acts of negligence. Concluding that Dr. Jones's report contains no
causal link between Mrs. Windsor's injury and the negligent acts pleaded by the
Windsors, the majority then holds that Dr. Jones's report does not constitute a
good faith effort at compliance with section 13.01(r)(6)'s definition of an
expert report. See Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(l),
(r)(6) (Vernon Supp. 2003).
The majority's analysis of section
13.01's good faith requirement is flawed. First, the majority's use of the
Windsors' pleadings to measure whether Dr. Jones's report constitutes a good
faith effort turns Texas pleading practice on its head. The Windsors pleaded a
single health care liability negligence claim against Dr. Maxwell--alleging that
he negligently performed Mrs. Windsor's January 14, 1998 arteriogram. See,
e.g., Lampasas v. Spring Ctr., Inc., 988 S.W.2d 428, 436 (Tex. App--Houston
[14th Dist.] 1999, no pet.) (recognizing that amended pleadings
simply adding factual variations of negligence claim did not preclude
no-evidence summary judgment because amendment did not constitute new theory of
recovery). The Windsors did not need to plead any specific acts of negligence by
Dr. Maxwell in the absence of special exceptions. See Tex. R. Civ. P. 45(b), 47(a), 48; see also
Boyles v. Kerr, 855 S.W.2d 593, 601 (Tex. 1993) (op. on reh'g)
(recognizing that the actual cause of action and the elements do not have to be
pleaded with specificity; it is sufficient if a cause of action can be
reasonably inferred). The Windsors could simply have pleaded that Dr. Maxwell
negligently performed the arteriogram on Mrs. Windsor on January 14, 1998 and
that his negligence in performing the arteriogram proximately caused Mrs.
Windsor to suffer a brain injury leaving her with permanent physical impairment
and other damages. See Roark v. Allen, 633 S.W.2d 804, 809 (Tex. 1982)
(rejecting argument that plaintiff must specifically plead negligent use of
forceps and upholding judgment based on simple negligence pleading).
Although the factual acts of
negligence pleaded by a plaintiff--especially in an original petition before
discovery--are not in any way binding or limiting on the plaintiff, the majority
for no apparent reason fixates on the Windsors' pleaded acts of negligence in
measuring the adequacy of Dr. Jones's report. Via this analysis, the majority
departs from the statutory requisites for a good faith effort at compliance with
section 13.01(r)(6)'s definition of an expert report and from controlling
supreme court case law. Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(l),
(r)(6); Palacios, 46 S.W.3d at 878. Utilizing this unconventional
procedure, akin to a trial court's consideration of a no-evidence motion for
summary judgment, the majority then concludes that the Windsors did not come
forward with a report addressing causation concerning their specifically pleaded
negligent acts so the trial court did not abuse its discretion in dismissing
with prejudice the Windsors' suit against Dr. Maxwell.
The plain language of article
4590i, section 13, however, nowhere requires an expert's report to correlate
with or support factual negligent acts pleaded by a claimant in a single health
care liability claim. The focus of the statute is on claims, not on the variety
of factual negligent acts asserted within a single claim. Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(d), (r)(2).
Moreover, one purpose of the expert-report requirement is to deter frivolous
claims, not to supplant current pleading practice. Accord Palacios, 46
S.W.3d at 877-78 (explaining purpose of expert-report requirement is to deter
frivolous claims). Thus, a claimant may simply plead that a health care provider
was negligent in the performance of some procedure, that his negligence
proximately caused injuries to the claimant, and that as a result the claimant
has suffered damages in excess of the jurisdictional limits of the court. See
Tex. R. Civ. P. 45, 47, 48. The claimant's expert
report would then necessarily be more specific than the claimant's general
pleading. Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(r)(6). Or, a
plaintiff may, as the Windsors, plead specific, sometimes alternative factual
negligent acts within a single negligence cause of action. See Tex. R. Civ. P. 45, 47, 48. That a
claimant's expert report or reports may or may not address every or any of the
specifically pleaded acts of negligence set forth in the petition is simply of
no import. Instead, courts are to look solely to the four corners of the report
to determine whether it constitutes a good faith effort at compliance. Palacios,
46 S.W.3d at 878 (holding that "a trial court should look no further than
the report in conducting a section 13.01(l) inquiry"). The
claimant's pleadings are relevant to a determination of the adequacy of an
expert report only to the extent that the defendant must be sued to trigger a
report due-date, and the plaintiff must be asserting a health care liability
claim to necessitate a report. Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(a), (d) (setting
report due-dates); Rogers v. Crossroads Nursing Serv., Inc., 13 S.W.3d
417, 418-19 (Tex. App.--Corpus Christi 1999, no pet.) (recognizing article 4590i
applies only to health care liability claims). I cannot agree with the majority
that anything in the statute or in existing case law authorizes the analysis the
majority engages in today--a comparison between pleaded factual acts of
negligence and causation expressed within an expert report concerning those
pleaded acts of negligence to determine the adequacy of an expert report.(2)
III. Dr. Jones's
Report, Under the Statute and Guiding Principles,
Constitutes a Good Faith Effort
Dr. Maxwell challenged only the
causation element of Dr. Jones's report. Article 4590i, section 13.01(r)(6)
requires that an expert report provide a fair summary of the causal relationship
between the defendant health care provider's negligence and the injury, harm, or
damages claimed. Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(r)(6). A court
may dismiss a claim based on the inadequacy of an expert report concerning
causation only if the report does not constitute a good faith effort to provide
a fair summary of the expert's causation opinions. Id. § 13.01(e)(3),
(l), (r)(6); see Bowie Mem'l Hosp., 79 S.W.3d at 52;
Palacios, 46 S.W.3d at 878. An expert report constitutes a good faith
effort if it provides enough information to inform the defendant of the specific
conduct the plaintiff has called into question and provides a basis for the
trial court to conclude that the claims have merit. Palacios, 46 S.W.2d
at 879. Moreover, a plaintiff need not present evidence in the report as if it
were actually litigating the merits. Id. The report can be informal in
that the information in the report does not have to meet the same requirements
as the evidence offered in a summary judgment proceeding or at trial. Id.
Here, Dr. Jones's report is two and
one-half pages, single spaced. The report indicates that Dr. Jones reviewed
specific past and present medical records of Mrs. Windsor. Dr. Jones's report
also specifically states that he reviewed an affidavit made by Mrs. Windsor.(3) Mrs. Windsor underwent a MRI on January 12,
1998, and Dr. Jones reviewed that report. The procedure at issue, a cerebral
angiogram, was performed by Dr. Maxwell on Mrs. Windsor on January 14, 1998. Dr.
Jones's report factually notes the problems with the January 14, 1998 procedure:

        
 The left vertebral artery was reportedly accessed but the catheter was
 reportedly removed following onset of nausea and vomiting, findings suggestive
 of vertebral artery distribution [i]schemia. The report [Dr. Maxwell's
 operative report] states that "multiple catheter exchanges were made to
 access the left vertebral anteriogram" [sic]. Intravascular heparin and
 "anti-vasospasm" therapy was begun, and a left subclavian
 arteriogram demonstrated a small intimal injury near the vertebral origin.
 Reduced flow was subsequently noted in the left vertebral artery.
  

Dr. Jones's report then goes on to
explain:

        
 An additional MRI brain dated 1/26/98, consisting of sagittal and axial
 T1-weighted, axial proton density and T2-weighted and MR angiography of the
 carotid bifurcation again shows [the same findings as the 1/12/98 MRI]. There
 are smaller areas of abnormally increased T2 signal in the left posterior
 cerebellar white matter and medial left cerebellar cortex, consistent with
 cerebellar infarct which appears new from the prior MR brain of 1/12/98.
 [Emphasis added.]
  

Under the "Opinions"
heading of his report, Dr. Jones explains, "The patient has suffered the
complication of an intimal injury to the left vertebral artery origin during
a cerebral angiogram on 1/14/98. A subsequent MRI confirms the presence of additional
cerebellar infarction . . . on the left corresponding to the left
vertebral artery injury." [Emphasis added.]
Thus, Dr. Jones's report makes it
clear that he compared a January 12, 1998 MRI of Mrs. Windsor's brain and a
January 26, 1998 MRI of Mrs. Windsor's brain and saw a "new" intimal
injury to the left vertebral artery and cerebellar infarction corresponding to
the vertebral artery injury on the January 26th MRI that did not
appear on the January 12th MRI. Dr. Jones even opined that these
injuries occurred "during a cerebral angiogram on 1/14/98," i.e., the
procedure performed by Dr. Maxwell. Thus, the report clearly outlines physical
tests documenting and confirming the "claimed injury," i.e., an
intimal injury to the left vertebral artery and a cerebellar infarction
corresponding to the vertebral artery injury, occurring during the procedure
performed by Dr. Maxwell.
Dr. Jones's report explained that
Mrs. Windsor developed nausea and vomiting during the procedure, a sign of
vertebral ischemia.(4) Mrs. Windsor swore in her
affidavit that at this point she withdrew consent for the procedure and told Dr.
Maxwell to stop. Mrs. Windsor swore that nevertheless Dr. Maxwell did not stop
and continued on with the procedure until she was vomiting uncontrollably and
lost control of her bowels. Dr. Jones's report opines:

        
 The patient has reported that consent was withdrawn to the procedure and that
 the procedure continued despite such withdrawal of consent, with subsequent
 infarction(5) documented above. The fact that
 the patient withdrew consent and the procedure continued with subsequent
 complications, is indicative that the actions by Dr. Maxwell did indeed fall
 below the standard of care.

Accordingly, Dr. Jones's report
summarizes: that during the January 14, 1998 cerebral arteriogram Mrs. Windsor
suffered an intimal injury--here a puncture wound--to her left vertebral artery,
the artery Dr. Maxwell had the catheter inserted into;(6)
that Mrs. Windsor began suffering an inadequate blood flow, ischemia, through
that artery, and as a result experienced nausea and vomiting; that Mrs. Windsor
asked Dr. Maxwell to stop the procedure; that the standard of care is to stop
the procedure immediately when the patient experiences nausea or vomiting or
requests that the procedure be stopped; that Dr. Maxwell failed to stop the
procedure when Mrs. Windsor experienced nausea and vomiting and requested that
it be stopped; and that because Dr. Maxwell refused to stop the procedure the
inadequate blood flow to Mrs. Windsor's cerebellum through the vertebral artery
continued and she suffered a "cerebellar infarction," i.e., tissue
damage, "corresponding to the left vertebral artery injury." I would
hold that this information, conveyed in Dr. Jones's report, provides a fair
summary of the causal relationship between Dr. Maxwell's negligence--failing to
stop the procedure upon withdrawal of consent and upon nausea and vomiting, both
signs of intimal injury induced vertebral ischemia, i.e., reduced blood flow
through the vertebral artery--and the injury claimed by Mrs. Windsor--a "cerebellar
infarction" "corresponding to the left vertebral artery injury"
and "subsequent infarction documented above," i.e., MRI-documented
cerebral brain tissue death. This information is sufficient to inform Dr.
Maxwell, or any other medical professional reading the report, of the specific
claims against Dr. Maxwell and is certainly sufficient to permit the trial court
to conclude that the Windsors' claims have merit.(7)
Consequently, Dr. Jones's report constitutes a good faith effort at compliance
with article 4590i, section 13.01(r)(6). Tex.
Rev. Civ. Stat. Ann. art. 4590i, § 13.01(r)(6).
Dr. Jones's report does not simply
recite, as the majority contends, that Mrs. Windsor's cerebral infarction merely
followed Dr. Maxwell's procedure but was not "caused" by the
procedure. Dr. Jones's report utilizes specific causative words, explaining that
Mrs. Windsor suffered a "cerebellar infarction . . . on the left corresponding
to the left vertebral artery injury." He explains that "The patient
has reported that consent was withdrawn to the procedure and that the procedure
continued despite such withdrawal of consent, with subsequent infarction
documented above." The adequacy of Dr. Jones's report does not
depend on whether he expressed causation using particular magic causation words.
See Bowie Mem'l Hosp., 79 S.W.3d at 53. The causation words Dr. Jones
chose are common to the medical field, are sufficient to apprise Dr. Maxwell of
the causation element of the Windsors' claim(8)
and to allow the trial court to conclude that the Windsors' claim has merit.
Moreover, the majority's holding
that Dr. Jones's report fails to explain "how continuance of the procedure
caused the infarction," overlooks the causative medical aspect inherent in
an infarction. An infarction, tissue death, is by definition always physically
caused by ischemia, an insufficient quantity of oxygenated blood reaching an
organ or tissue until tissue death results, just as a broken arm is by
definition always physically caused by excessive forces brought to bear on the
arm bone. Here Dr. Jones explained the "cause" of Mrs. Windsor's
continued ischemia: Dr. Maxwell's failure to stop the procedure despite the
increasingly severe symptoms of ischemia Mrs. Windsor was experiencing. He
explained that the standard of care is to immediately stop the procedure upon
the occurrence of these symptoms of ischemia, and noted that Dr. Maxwell did not
stop, "with subsequent infarction documented above." Any physician
reading the report would have no doubt that Mrs. Windsor suffered an intimal
injury to the left vertebral artery (here, a puncture wound to the artery being
catheterized); she began suffering vertebral ischemia (reduced blood flow
through the artery being catheterized) during the procedure;(9)
that no action (i.e., termination of the procedure and removal of the catheter)
was taken to alleviate the ischemia; and that as a result a full-blown cerebral
infarction (inadequate blood flow and resultant tissue death documented by a
subsequent MRI) in the area served by the artery occurred. Continuation of the
cerebral angiogram in light of increasingly severe symptoms of ischemia caused
the subsequent infarction just as increasing physical force on an arm bone will
cause it to break. Based on the medical facts here, it is unnecessary to
require, as the majority does, Dr. Jones to state "how continuation of the
procedure caused the infarction" just as it would be unnecessary to require
a doctor to state how continued application of force to an arm bone caused it to
break. Bones break when exposed to excessive force. Tissue dies when deprived of
adequate oxygenated blood. Dr. Maxwell failed, even when Mrs. Maxwell suffered
increasingly severe symptoms of oxygen deprivation to her brain, to halt the
procedure and alleviate the oxygen deprivation, causing tissue death in Mrs.
Windsor's brain. The causation facts and opinion in Dr. Jones's report render it
a good faith effort at compliance with section 13.01(r)(6)'s expert report
requirement concerning causation.
Finally, I cannot agree with the
majority's analysis of Dr. Jones's statement, "The patient has reported
that consent was withdrawn to the procedure and that the procedure continued
despite such withdrawal of consent, with subsequent infarction
documented above." The majority asserts that it is possible to
give two different meanings to this statement: it may simply be a factual
statement reported by Mrs. Windsor to Dr. Jones that the infarction occurred
after she withdrew her consent, or it may be Dr. Jones's opinion that the
infarction occurred after Mrs. Windsor withdrew her consent. The issue is
settled, however, in the very next sentence of Dr. Jones's report where he
states, "The fact that the patient withdrew consent and the
procedure continued with subsequent complications, is indicative that
the actions by Dr. Maxwell did indeed fall below the standard of care."
Although this statement addresses the standard of care issue, it also clarifies
Dr. Jones's meaning in the prior sentence. It clarifies that it is Dr. Jones's
opinion that the procedure continued with subsequent complications. A sentence
in an expert report may address both causation and standard of care. No
one-element-per-sentence rule exists. Dr. Jones could have simply stated that
continuance of the procedure after the patient withdrew consent violated the
standard of care. But he didn't. He incorporated and adopted as his opinion that
the "procedure continued with subsequent complications."
A trial court abuses its discretion
when it misapplies the law to the facts. Walker v. Packer, 827 S.W.2d
833, 840 (Tex. 1992) (orig. proceeding) (holding, "A trial court has no
'discretion' in determining what the law is or applying the law to the
facts."). A trial court also abuses its discretion when it makes a choice
that is legally unreasonable in the factual-legal context in which it is made.
W. Wendall Hall, Standards of Review in Texas, 34 St. Mary's L. J. 1,
15-16 (2002). The trial court is required under section 13.01(l), Bowie
Memorial Hospital, and Palacios to view the entire report in
assessing its adequacy. Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(l)
(requiring trial court to examine report to see if it represents good faith
effort to comply with the definition of an expert report); Bowie Mem'l Hosp.,
79 S.W.3d at 53 (explaining trial court should review information within four
corners of report); Palacios, 46 S.W.3d at 878 (holding trial court
should look to four corners of report in conducting 13.01(l) inquiry).
The construction of the sentence,
"The patient has reported that consent was withdrawn to the procedure and
that the procedure continued despite such withdrawal of consent, with the
subsequent infarction documented above" to mean only that Mrs. Windsor told
Dr. Jones the infarction occurred subsequent to her withdrawal of consent is
incompatible with the next sentence of Dr. Jones's report. Such a construction
of this sentence, in light of the report as a whole, is a misapplication of the
law, arbitrary, and legally unreasonable in the factual-legal context in which
it is made. To the extent the trial court utilized this possible alternative
construction of a single sentence in Dr. Jones's two and one-half page report to
negate the report's overall expression of Dr. Jones's causation opinion that
Mrs. Windsor's prolonged ischemia was due to Dr. Maxwell's refusal to stop the
procedure and resulted in a subsequent infarction corresponding to the vertebral
artery puncture wound injury, the trial court abused its discretion.
Moreover, viewing this sentence in
Dr. Jones's report in conjunction with the sentence that follows it, is not
"reviewing the evidence in the light most favorable to the non-prevailing
party" as the majority contends. The trial court's focus in making a
section 13.01(l) adequacy determination is supposed to be upon whether
the expert report constitutes a good faith effort at compliance with section
13.01(r)(6) by informing the defendant of the specific conduct called into
question and providing a basis for the trial court to conclude that the claims
have merit. See Tex. Rev. Civ. Stat. Ann. art. 4590i, §13.01(l),
(r)(6); Bowie Mem'l Hosp., 79 S.W.3d at 53; Palacios, 46
S.W.3d at 878. Dr. Jones's report accomplishes these purposes. The trial court
does not have the discretion, as the majority apparently believes, to generate
ambiguities in expert reports by viewing single sentences in isolation and
giving them alternative meanings incompatible with the report as a whole. Accord,
e.g., Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587,
589 (Tex. 1996) (recognizing that no ambiguity exists when one of two possible
interpretations of sentence is not reasonable in light of construction of
document as a whole). The fact that one sentence in Dr. Jones's report, when
considered in isolation, may be construed as having two meanings does not render
his report not a good faith effort at compliance with section 13.01(r)(6).
Lastly, the majority attempts to
analogize Dr. Jones's report to the Wrights' expert report in Bowie Memorial
Hospital v. Wright. 79 S.W.3d at 52-53. Dr. Jones's report is vastly
different from the Wrights' expert report opining that "if the x-rays [of
Mrs. Wright's foot] would have been correctly read and the appropriate medical
personnel acted upon those findings then [Mrs. Wright] would have had the
possibility of a better outcome." Id. (emphasis added). 
The Wrights' expert opined only that if the x-rays had been correctly
read and if medical personnel acted on those x-rays, then
possibly Wright could have had a better outcome. Id. Here, Dr. Jones's
opinion is not an
if-this-and-if-that-then-a-possibility-of-a-better-outcome-exists opinion. Dr.
Jones's opinion is that Dr. Maxwell's negligence in refusing to halt the
procedure caused a "subsequent infarction," "corresponding to the
left vertebral artery injury," i.e., a this-negligence-caused-that-injury
opinion.
IV. Conclusion
For all of the above reasons, I
dissent. Under the statutory language and controlling case law, Dr. Jones's
report constitutes a good faith effort at compliance with the statutory
definition of an expert report. See Tex. Rev. Civ. Stat. Ann. art.
4590i, § 13.01(l). Consequently, the trial court abused its discretion
by dismissing the Windsors' health care liability claim. I would sustain the
Windsors' first issue and reverse the trial court's dismissal order.
 
                                                                      
SUE WALKER
                                                                      
JUSTICE
 
DELIVERED: August 27, 2003
 

 
 
 
 
 
 
 
 
 


Majority
Opinion End Notes:
1. The dissent is incorrect in its heavy reliance on
certain words it culls from one sentence of Dr. Jones' report, which the dissent
then stretches to arrive at a meaning that the trial court, acting within its
discretion, was clearly not required to join. The dissent would require the
sentence "[t]he fact that the patient withdrew consent and the procedure
continued with subsequent complications, is indicative that the actions by
Dr. Maxwell did indeed fall below the standard of care[,]" to be
interpreted not only as a statement going to the standard of care, but also as a
statement that explained the causal connection between alleged mid-procedure
withdrawal of consent and the injury suffered by Ms. Windsor. We believe the
trial court would have acted within its discretion in concluding that Dr. Jones
was describing, in this sentence, the breach of the standard of care
requirement, not explaining the issue of causation. The dissent's analysis of
this sentence improperly attempts to review the evidence in the light most
favorable to the non-prevailing party, rather than accord the trial court the
benefit of its discretion. See Palacios, 46 S.W.3d at 877 (directing
reviewing courts not to indulge in reasonable inferences or resolve doubts in
the nonmovant's favor, but instead provide deference to the trial court's
decision).
2. At one point the dissent declares that Dr. Jones'
opinion was that Dr. Maxwell's negligence in refusing to halt the procedure "caused"
a subsequent infarction; at another, the dissent declares that Dr. Jones'
report summarized that "because" Dr. Maxwell refused to stop
the procedure, there was inadequate blood flow through the cerebellum. No such
language (nor any similar language) is contained in the report. Only through the
use of inferences contrary to the trial court's ruling can the dissent's
position be maintained.
3. It is also noteworthy that the trial court provided the
Windsors the opportunity to provide an amended report to cure the missing
explanation of causation, but that the Windsors filed an amended report that did
not do so. After Dr. Maxwell moved for dismissal on several grounds, including
the ground that Dr. Jones' expert report did not adequately explain how Dr.
Maxwell's conduct caused the injury, the trial court gave the Windsors an
additional 30 days "to provide a sufficient written report." Upon the
expiration of the 30-day period, with the record still absent an explanation by
an expert of how Dr. Maxwell's conduct caused the injury, the trial court
dismissed the suit.
4. The infarction (tissue death due to inadequate blood
supply) the Windsors alleged to have occurred was brain tissue damage they
pleaded was caused by the catheter penetrating the brain. In support of that
claim, the Windsors' appellate attorney stated during oral argument that the
infarction injury noted by Dr. Jones in his review of the MRI "was the
result of the catheter . . . being pushed through the artery . . . into the
white matter of her brain." The attorney further noted that Dr. Jones
describes "a left anterior/inferior parietal infarct which is the path that
the catheter went through into the white brain matter." The dissent
implicitly disagrees with the Windsors' analysis and concludes, without any
support in the pleadings, that Dr. Jones was actually describing an injury that
occurred when the catheter remained too long in the artery and blocked the
necessary blood flow, causing tissue death in the area served by the artery
above the blockage.

Dissenting Opinion End Notes:
1. A copy of Dr. Jones's report, in its entirety, is
attached.
2. The next step in the majority's
facts-pleaded-must-match-report's-opinions analysis will be the reversal of a
trial court's dismissal order in part when a specific factual pleading is
supported by a specific correlating opinion in an expert report, and an
affirmance of a trial court's dismissal order in part as to those specific
factual allegations lacking a correlating specific opinion in an expert report.
Thus, application of the analytical framework used by the majority will lead to
complicated and statutorily unintended results.
3. The record from the motion to dismiss hearing
indicates that Mrs. Windsor herself is a nurse, that she was awake during the
procedure, and that because she had not yet been deposed at the time the expert
report was due, she executed an affidavit setting forth the events that occurred
during the procedure and provided that affidavit to Dr. Jones for him to rely
upon in making his report.
4. Ischemia is "a low oxygen state usually due to
obstruction of the arterial blood supply or inadequate blood flow leading to
hypoxia in the tissue." On-Line Medical Dictionary, Dept. of Medical
Oncology, University of Newcastle upon Tyne (2003), at http://cancerweb.ncl.ac.uk./cgi-bin/omd?ischemia.
5. An infarct is "an area of tissue death due to
local lack of oxygen." Id. at http://cancerweb.ncl.ac.uk./cgi-bin/omd?infarct.
6. The majority fails to recognize that the puncture of
the vertebral artery resulted in reduced blood flow through the artery. Dr.
Jones's report even mentions that "[r]educed flow was subsequently noted in
the left vertebral artery."
7. In light of the factual causation information provided
in Dr. Jones's report, I cannot agree with the majority that it is conclusory. Cf.
Earle v. Ratliff, 998 S.W.2d 882, 890 (Tex. 1999) (holding defendant
doctor's summary judgment affidavit stating, "use of Steffe pedicle screws
and plates met the standard of care" was conclusory because it "states
only the conclusion that Earle met the applicable standard of care"). As
outlined above, Dr. Jones's non-summary judgment expert report provides facts
explaining the basis for his causation opinion.
8. Recall that Dr. Maxwell did not challenge the adequacy
of Dr. Jones's report on any other ground.
9. Dr. Jones's report recognizes that reduced blood flow
through Mrs. Windsor's left vertebral artery was documented by the subsequent
left subclavian arteriogram.