Affirmed and Memorandum Opinion
filed March 16, 2010.

In
The

Fourteenth
Court of Appeals



NO. 14-09-00538-CV



University of
Texas Medical Branch - Galveston,
Appellant 

v.

James
Nightingale, Individually and as Independent Executor of the Estate of Karen
Nightingale, Deceased, Appellee 



On Appeal from
the Probate Court

Galveston County, Texas

Trial Court
Cause No. 68,400A



 

M E M O R A N D U M   O P I N I O N


This is a healthcare liability case governed by
chapter 74 of the Texas Civil Practice and Remedies Code.[1]  Appellant,
University of Texas Medical Branch - Galveston (“UTMB”), filed this
interlocutory appeal to challenge the trial court’s order denying its motion to
dismiss based on appellee’s alleged failure to file a sufficient expert report.
 We affirm. 

I.  BACKGROUND

Mrs. Nightingale suffered from a congenital heart
condition known as coarctation, or the narrowing, of the aorta.  To correct the
coarctation, Mrs. Nightingale underwent a non-invasive procedure at UTMB.  Dr.
Barry Uretsky, a UTMB faculty member, performed the corrective procedure,
electing to use percutaneous balloon angioplasty—dilation of a constricted
vessel by injecting and advancing a balloon-tipped catheter to the narrowed
vessel.  During the angioplasty, Mrs. Nightingale experienced severe chest
pains, and the angioplasty procedure was terminated.  After losing a
substantial amount of blood, Mrs. Nightingale received blood transfusions and ultimately
needed to undergo emergency surgery.

The following day, an emergency aortic resection was
performed on Mrs. Nightingale by Drs. Scott Lick and Vincent Conti to
surgically correct the coarctation.  Despite post-operative bleeding and cardiac
tamponade, Mrs. Nightingale appeared to be recovering well after the resection
surgery.  Two weeks later, however, Mrs. Nightingale suffered from cardiac
arrest and was rushed to emergency surgery again.  The second emergency surgery
revealed a partial disruption of the proximal aortic suture line.  While undergoing
surgery to correct the partial vessel disruption, Mrs. Nightingale died.  Mrs.
Nightingale’s widower, appellee, James Nightingale, individually and as
independent executor of the estate of Karen Nightingale, deceased, filed the
underlying health care liability lawsuit against UTMB.  

In his lawsuit, Mr. Nightingale claimed that Dr.
Uretsky was negligent in performing the percutaneous balloon angioplasty on
Mrs. Nightingale and that such negligence caused Mrs. Nightingale’s death.  To
support his negligence claims against UTMB, Mr. Nightingale filed an expert
report by Dr. Neal Shadoff, a board certified cardiologist.  Dr. Shadoff opined
that prior to the balloon angioplasty, Mrs. Nightingale suffered from calcified
and stenotic coarctation of the aorta and membranous VSD—an abnormal opening
between the two heart chambers.  Dr. Shadoff opined that the combination of these
two additional heart deficiencies increased the risks normally associated with
balloon angioplasty, including vessel rupture.  Thus, according to Dr. Shadoff,
the non-surgical catheter-based balloon angioplasty performed by Dr. Uretsky
would have been unsuccessful on Mrs. Nightingale.  Dr.  Shadoff further opined
in his report that he believed Mrs. Nightingale had a cystic medial necrosis of
a vessel wall, additionally increasing the normally associated risks with
balloon-angioplasty dilation.  Dr. Shadoff concluded in his expert report that
UTMB was negligent by:

            (1)       performing
a catheter-based balloon angioplasty on a patient with calcified and stenotic
coarctation and membranous VSD;

(2)       failing to perform surgery as the primary
corrective procedure;

(3)       using an improper balloon size during the
angioplasty;

(4)       using excessive inflation pressure during the
angioplasty; and

(5)       failing to timely or immediately perform
corrective surgery or stent the disrupted vessel upon vessel disruption that
occurred during the balloon angioplasty.

Dr. Shadoff further opined that UTMB should have:

(1)       recognized the full extent of Mrs.
Nightingale’s condition, including the calcified and stenotic coarctation,
membranous VSD, and possibly cystic medial necrosis, before performing the
angioplasty procedure;

(2)       considered surgery to dilate the
constricted vessel by stent or resection;

(3)       used an appropriate size balloon during the
angioplasty procedure;

(4)       used less inflation pressure during the
angioplasty procedure; and 

            (5)       recognized
when the vessel rupture occurred during the angioplasty procedure and performed
immediate or timely surgery—resection—or implanted a stent on the ruptured
vessel upon disruption.    

UTMB filed objections to Dr. Shadoff’s expert report and
moved to dismiss Mr. Nightingale’s suit.  UTMB contended that Dr. Shadoff was
not qualified to tender an expert report and that his report was inadequate.  Specifically,
UTMB claimed that Dr. Shadoff was not qualified to render an expert opinion
regarding the standard of care of each UTMB staff member because Dr. Shadoff
did not have expertise in all disciplines unique to each UTMB employee.  UTMB
further contended that Dr. Shadoff’s expert report was inadequate because it
did not state (1) the applicable standard of care, (2) the manner in which UTMB
breached the applicable standard of care, and (3) the causal relationship
between the applicable standard of care and the alleged injury.  Mr.
Nightingale responded to UTMB’s objections and motion to dismiss, maintaining
that the report complied with the statutory requirements, and in the
alternative, requested 30 days to amend the report to comply with the statute. 
After a hearing on UTMB’s motion, the trial court denied UTMB’s objections and the
motion to dismiss.  In turn, UTMB brought this interlocutory appeal to
challenge the trial court’s ruling.  See Tex. Civ. Prac. & Rem. Code
§ 51.014(9).

On appeal, UTMB reurges its objections to Dr.
Shadoff’s expert report, arguing in four issues that Dr. Shadoff is not
qualified to tender an expert report in the underlying cause and that his
report is inadequate.  

II.   STANDARD OF REVIEW

We review a trial court’s denial of a motion to
dismiss under section 74.351 for an abuse of discretion.  Am. Transitional
Care Ctrs. Of Tex., Inc. v. Palacios, 46 S.W.3d 873, 875 (Tex. 2001); Group
v. Vicento, 164 S.W.3d 724, 727 (Tex. App.—Houston [14th Dist.] 2005, pet.
denied).  Likewise, we review a trial court’s determination of whether a
physician is qualified to opine in a health care liability case under an abuse-of-discretion
standard.  Larson v. Downing, 197 S.W.3d 303, 304–05 (Tex. 2006) (per curiam);
Mem’l Hermann Healthcare Sys. v. Burrell, 230 S.W.3d 755, 757 (Tex.
App.—Houston [14th Dist.] 2007, no pet.).  A trial court abuses its discretion
if it acts in an arbitrary or unreasonable manner without reference to any
guiding rules or principles.  Larson, 197 S.W.3d at 304–05; Kelly v.
Rendon, 255 S.W.3d 665, 672 (Tex. App.—Houston [14th Dist.] 2008, no pet.). 
Furthermore, when reviewing matters assigned to the trial court’s discretion, we
may not substitute our judgment for the trial court’s judgment.  Bowie Mem’l
Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex. 2002); see also Burrell, 230
S.W.3d at 757.  

III.  ANALYSIS

In four issues, UTMB challenges Dr. Shadoff’s
qualifications to tender an expert report in the underlying cause and the
adequacy of his report.  Taken out of order, UTMB specifically claims that the
trial court erred in denying its motion to dismiss because: (1) Dr. Shadoff is
not qualified to tender an expert report on the applicable surgical standard of
care, the applicable standard of care for the entire UTMB staff, and causation;
(2) Dr. Shadoff’s expert report is inadequate to the extent that it contains
conclusory statements regarding the applicable standard of care, breach of the
applicable standard of care, and causation; (3) Dr. Shadoff’s expert report does
not address Mr. Nightingale’s claims relating to the size of the catheters used
during Mrs. Nightingale’s angioplasty; and (4) there is no expert report
supporting any claim against UTMB. 

A.  Dr. Shadoff’s Qualifications to Tender An Expert Report

In UTMB’s first issue, it challenges Dr. Shadoff’s
qualifications to tender an expert report in the underlying cause regarding (1)
the angioplasty procedure performed on Mrs. Nightingale and (2) the need to
perform surgery, not balloon angioplasty, to correct the coarctation of Mrs.
Nightingale’s aorta.  An expert providing opinion testimony in a medical
malpractice suit must establish that he is qualified to do so.  See Tex.
Civ. Prac. & Rem. Code §§ 74.351(r)(5)(A), 74.401.  To be qualified to
provide opinion testimony regarding whether a physician departed from the
accepted standard of care, an expert must satisfy the requirements of section
74.401.  See Tex. Civ. Prac. & Rem. Code § 74.351(r)(5)(A).  Section
74.401 provides in relevant part:

(a)       In a suit involving a health care liability claim
against a physician    for injury to or death of a patient, a person may
qualify as an expert witness on the issue of whether the physician departed
from     accepted standards of medical care only if the person is a physician who:

            (1)       is practicing medicine at the time
such testimony is given or was practicing medicine at the time the claim
arose;

            (2)       has knowledge of accepted standards
of medical care for the diagnosis, care, or treatment of the illness, injury,
or condition involved in the claim; and 

            (3)       is qualified on the basis of training
or experience to offer an expert opinion regarding those accepted standards of
medical care.

(b)       For purposes of this section, “practicing
medicine” or “medical practice” includes, but is not limited to, training
residents or students at an accredited school of medicine or osteopathy or serving
as a consulting physician or other physicians who provide direct
patient care, upon the request of such other physicians.

(c)       In determining whether a witness is qualified on
the basis of training or experience, the court shall consider whether, at the
time the claim arose or at the time the testimony is given, the witness:

            (1)       is board certified or
has other substantial training or   experience in an area of medical
practice relevant to the claim;
and 

            (2)       is actively practicing medicine in rendering
medical care      services relevant to
the claim.  

Id. § 74.401(a)-(c)
(emphasis added).  An expert’s qualifications must appear in the expert report
and cannot be inferred.  See Palacios, 46 S.W.3d at 878; see also
Baylor Coll. of Med. v. Pokluda, 283 S.W.3d 110, 117 (Tex. App.—Houston
[14th Dist.] 2009, no pet.).  Accordingly, analysis of section 74.351 expert
qualifications is limited to the four corners of the expert’s report and the
expert’s curriculum vitae.  Pokluda, 283 S.W.3d at 117; Burrell,
230 S.W.3d at 758.

UTMB contends that Dr. Shadoff is not qualified to render
an expert opinion regarding the angioplasty performed on Mrs. Nightingale and
the need for corrective surgery because (1) neither Dr. Shadoff’s expert report
nor CV reflect that he has performed the same surgery—balloon angioplasty—on a
patient with the same or similar heart condition as Mrs. Nightingale—coarctation
of the aorta; (2) Dr. Shadoff has no knowledge of or experience with
catheter-based procedures; and (3) Dr. Shadoff is not a surgeon.  The
applicable standard is whether Dr. Shadoff is qualified to render expert
testimony regarding Mr. Nightingale’s claim that Dr. Uretsky departed from
accepted standards of care in treating Mrs. Nightingale for her heart condition. 
See Tex. Civ. Prac. & Rem. Code § 74.401.  Section 74.401(d)
provides that a court “shall apply” the following factors in determining
whether an expert is qualified to offer expert testimony:  (1) he practices
medicine; (2) he has knowledge of accepted standards of medical care for the
treatment or care involved in the claim; (3) he has training or experience
regarding those accepted standards of medical care; (4) he is board certified; (5)
he has substantial training or experience in an area of medical care relevant
to the claim; and (6) he actively participates in rendering medical services
relevant to the claim.  See id. § 74.401(a)-(c). 

Here, Dr. Shadoff’s expert report and CV reflect that
he has been practicing cardiology since 1983 and is board certified in
cardiovascular disease and interventional cardiology—a medical specialty of
cardiology specializing in catheter-based heart disease treatments.  Dr.
Shadoff’s report and CV reflect that he has participated in the evaluation of and
management decisions on patients suffering coarctation of the aorta.  He has
also performed percutaneous balloon angioplasty procedures.  Dr. Shadoff’s CV
reflects that he has been involved as an investigator and researcher in
numerous test trials on patients undergoing coronary angioplasty or stent
replacement.  Dr. Shadoff indicates in his report that based upon his training
and knowledge of current literature, he is “familiar with the standard of care
regarding the evaluation and management of coarctation of the aorta and
interventional procedures [performed] on adults with congenital heart
disease.”  Based on Dr. Shadoff’s education, training, and experience in
catheter-based heart disease treatments and working with patients suffering
from coarctation of the aorta, we find that the trial court acted within its
discretion in concluding that Dr. Shadoff was qualified to render an opinion on
the standard of care, breach of the standard of care, and causation at issue in
the underlying cause.    

Moreover, we reject UTMB’s arguments that Dr. Shadoff
is not qualified because: (1) he has no experience in catheter-based procedures
and (2) neither his report nor CV reflect that he has performed a balloon
angioplasty, or similar procedure, on a patient with coarctation.  The four
corners of Dr. Shadoff’s expert report reflect that he has knowledge, training,
or experience in catheter-based procedures:  he is board certified in
interventional cardiology—a medical specialty in catheter-based heart disease
treatments—and has “training, experience, and knowledge of . . . current . . .
literature regarding interventional catheterization procedures.”  Furthermore,
Dr. Shadoff has performed percutaneous balloon angioplasty procedures.  With
respect to UTMB’s argument that Dr. Shadoff is not qualified because he has not
performed a similar procedure on a patient with coarctation, this Court
recently rejected a similar argument, reasoning that the statute is not so
narrow as to render an expert unqualified under chapter 74 merely because he
has not performed the exact procedure in question.  See Pokluda,
283 S.W.3d at 120 (stating there is no basis for “the proposition that a
surgeon must have performed exactly the same surgery as the defendant surgeon
in order to render an expert opinion”).  Dr. Shadoff’s expert report reflects
that he has performed balloon angioplasty procedures and that he has made
management decisions with regard to patients with the same heart condition as
Mrs. Nightingale’s.  Furthermore, Dr. Shadoff’s report and CV reflect that he
is a board certified cardiologist in two areas:  cardiovascular disease and
interventional cardiology, a medical specialty in catheter-based heart disease
treatments.  See Tex. Civ. Prac. & Rem. Code § 74.401(c) (reasoning
that a court must consider whether the proffered expert is “board certified or
has other substantial training or experience in an area of medical practice
relevant to the claim and rendering medical care services relevant to the claim”);
see also Pokluda, 283 S.W.3d at 119.  Dr. Shadoff’s CV also reflects
that he has been involved as an investigator in numerous test trials on
patients undergoing coronary angioplasty or stent replacement. We conclude that
Dr. Shadoff’s report and CV reflect knowledge, training, and experience in the
area of medicine relevant to Mr. Nightingale’s claim—surgical and
catheterization treatments in patients with coarctation.

We also reject UTMB’s argument that Dr. Shadoff is
not qualified because he is not a surgeon.  This Court has held that an expert
need not be a surgeon to be qualified if the expert is shown to have skill,
experience, training, or education regarding the specific issue before the trial
court.  See Reardon v. Nelson, No. 14-07-00263-CV, 2008 WL 4390689, at *
5 (Tex. App.—Houston [14th Dist.] Sept. 30, 2008, no pet.) (mem. op.); see
also Rendon, 255 S.W.3d at 674 (recognizing “the statute does not
require a medical expert be practicing in the exact same field as the defendant
physician, but instead must only be actively practicing medicine in rendering
medical care services relevant to the claim”) (emphasis added).  Here,
the issue before the trial court and the relevant medical services are those
for surgical and non-surgical coarctation correction.  As noted above, Dr.
Shadoff is a board certified cardiologist with a specialty in catheter-based
heart disease treatments.  He has worked with patients suffering from the same
congenital heart condition as Mrs. Nightingale and has performed percutaneous
balloon angioplasty procedures.  Furthermore, his CV reflects that he has been involved,
either as a researcher or investigator, in clinical trials involving stenting,
catheterization, and coarctation correction.  Based on the foregoing, we find
that the trial court did not abuse its discretion in concluding that Dr.
Shadoff was qualified to render an opinion in the underlying cause. 
Accordingly, we overrule UTMB’s first issue challenging the qualifications of
Dr. Shadoff.

B.  Adequacy of Dr. Shadoff’s Expert Report

UTMB’s second and third issues challenge the adequacy
of Dr. Shadoff’s expert report.  Under chapter 74, an expert report is defined
as a written report by an expert that provides a fair summary of the expert’s
opinions regarding (1) the applicable standard of care; (2) the manner in which
the care provided failed to meet that standard; and (3) the causal relationship
between that failure and the injury, harm, or damages claimed.  Tex. Civ. Prac.
& Rem. Code § 74.351(r)(6); see also Wright, 79 S.W.3d at 521.  A
report cannot merely state the expert’s conclusions about these elements.  Wright,
79 S.W.3d at 52; Palacios, 46 S.W.3d at 878–79.  The expert must explain
the basis for his statements and must link his conclusions to the facts.  Wright,
79 S.W.3d at 52 (quoting Earle v. Ratliff, 998 S.W.2d 882, 890 (Tex.
1999)).  Nevertheless, an expert report need not marshal all of the plaintiff’s
proof, but it must include the expert’s opinion on each of the elements
identified in the statute.  Palacios, 46 S.W.3d at 878–79; Rendon,
255 S.W.3d at 672.  Moreover, to avoid dismissal, a plaintiff need not present
all the evidence necessary to litigate the merits of his case.  Palacios,
46 S.W.3d at 879; Patel v. Williams, 237 S.W.3d 901, 904 (Tex.
App.—Houston [14th Dist.] 2007, no pet.).  The report may be informal in that
the information need not meet the standards required of evidence offered in a
summary judgment proceeding or at trial.  Palacios, 46 S.W.3d at 879; Patel,
237 S.W.3d at 904.  Rather, the expert report need only to incorporate
sufficient information to (1) inform the defendant of the specific conduct the
plaintiff has called into question and (2) provide a basis for the trial court
to conclude the claims are meritorious.  Wright, 79 S.W.3d at 52. 

Furthermore, the trial court should grant a motion
challenging the adequacy of an expert report only when it appears that the
report does not represent a good faith effort to comply with the statutory
definition of an expert report.  Tex. Civ. Prac. & Rem. Code § 74.351. 
When determining if a good faith effort has been made, the trial court is
limited to the four corners of the report and cannot consider extrinsic
evidence.  See Wright, 79 S.W.3d at 52; see also Palacios,
46 S.W.3d at 878.

Here, UTMB first claims that Dr. Shadoff’s expert report
is inadequate because the report contains conclusory statements regarding the
applicable standard of care, breach of the applicable standard of care, and
causation.  Contrary to UTMB’s contentions, Dr. Shadoff’s expert report does
not contain conclusory statements regarding the applicable standard of care,
breach, and causation.  Dr. Shadoff stated the following in his expert report:

The standards of care for the evaluation and management of
coarctation of the aorta in adults is as follows:

1.         Recognize which vessels are amenable to
percutaneous catheter based intervention and which vessels and clinical
circumstances require surgical repair;

2.         Consider both percutaneous and open surgical
procedures for repair so as to be able to discuss both options with a patient
and family in order to allow the patient and family to participate in
therapeutic    decisions  and informed consent;

3.         Perform interventional procedures in a safe and
effective manner, recognizing when the risk or occurrence of a percutaneous
balloon approach complication should result in procedure termination and/or crossover
to surgery;

4.         Use appropriately sized balloons for angioplasty
when it is the chosen interventional approach and have stents available for
balloon angioplasty failure;

5.         Use appropriate levels of balloon inflation
pressure to achieve successful dilation without causing vessel disruption;

6.         Recognize when potentially life threatening
complications occur during attempted percutaneous intervention; and 

7.         Arrange for surgery in a timely fashion when
vessel disruption occurs during balloon angioplasty in a calcified coarctation
of the aorta when stent implantation [is not] undertaken as a salvage procedure
to prevent death.  

. . . Dr. Uretsky and . . . [UTMB] . . . breached the
standards of care in their evaluation and treatment of [Mrs.] Nightingale in
the following respects:

1.         Failed to recognize that a calcified coarctation
of the aorta with associated membranous VSD required surgical repair and not a catheter
based approach;

2.         Failed to adequately review the therapeutic
options with Mr. and Mrs. Nightingale;

3.         Failed to perform percutaneous angioplasty in a
reasonable manner;

4.         Failed to use appropriately sized balloons for
the clinical situation;

5.         Failed to use appropriate balloon inflation
pressures for the clinical situation;

6.         Failed to recognize the serious and life
threatening nature of the percutaneous balloon dilation procedure complication
of vessel disruption; and

7.         Failed to arrange for Mrs. Nightingale to have
surgery in a timely fashion following the complication during the percutaneous interventional
procedure.

It is my opinion, based upon the reasonable medical
probability that the above delineated breaches of the standard of care directly
resulted in Mrs. Nightingale’s death.

Dr. Shadoff’s report does not contain mere conclusory
statements regarding the applicable standard of care, breach, and causation. 
To the contrary, the report is a fair summary of Dr. Shadoff’s opinions
regarding (1) the applicable standard of care; (2) the manner in which the care
provided failed to meet that standard; and (3) the causal relationship between
that failure and the injury, harm, or damages claimed.  See Tex. Civ.
Prac. & Rem. Code § 74.351(r)(6).

UTMB further claims that the report is inadequate
because the report does not address Mr. Nightingale’s claims involving the size
of the catheters used during Mrs. Nightingale’s angioplasty.  In Mr.
Nightingale’s amended petition, he contends that the size of the catheter
was improper; Dr. Shadoff, in his expert report, indicated that the size of the
balloon was improper.  Because of this discrepancy, UTMB contends
that the expert report does not support any complaint regarding the size of the
catheter used during the angioplasty.  We disagree.  The record reflects that
the device at issue was a balloon-tipped catheter.  Correspondingly, Mr.
Nightingale’s suit complains of the size of the balloon-tipped catheter, as
does Dr. Shadoff’s report.  Applying the appropriate standard, we conclude that
the expert report is a good faith effort to comply with the statutory
requirements of an expert report.  See id. § 74.351. 
Accordingly, we overrule UTMB’s second and third issues.

C.  Expert Report Regarding UTMB Staff

In its fourth issue, UTMB contends that Dr. Shadoff
is not qualified to tender an expert report on the standard of care required by
the entire UTMB staff because each employee has a separate distinct
discipline.  UTMB cites to an isolated sentence in Dr. Shadoff’s expert report
that “Dr. Uretsky and the staff of [UTMB] breached the standards of care in their
evaluation and treatment of Mrs. Nightingale.”  However, despite this general
statement, Mr. Nightingale’s amended petition and Dr. Shadoff’s expert report
complain of UTMB, through Dr. Uretsky, not other UTMB employees. 
Specifically, Dr. Shadoff opined that UTMB was vicariously negligent in
connection with Dr. Uretsky’s evaluation and management of Mrs. Nightingale.  Neither
the petition nor the expert report charges other UTMB staff members with
liability regarding Mrs. Nightingale’s death.  Because UTMB’s alleged liability
is purely vicarious through only Dr. Uretsky and because the expert report is
adequate as to Dr. Uretsky, we conclude that the report is adequate as to
UTMB.  See Gardner v. U.S. Imaging, Inc., 274 S.W.3d 669, 671–72 (Tex.
2008) (concluding that when a party’s alleged health care liability is purely
vicarious for the actions of its employee, an expert report is sufficient as to
health care facility if the expert report is adequate as to that particular
employee). Accordingly, UTMB’s argument is without merit, and we overrule its
fourth issue.  

IV.  CONCLUSION

Having overruled all of UTMB’s issues, we affirm the
trial court’s order denying UTMB’s objections and motion to dismiss.  

 

                                                                                    

                                                                        /s/        Adele
Hedges

                                                                                    Chief
Justice

 

 

 

Panel consists of Chief Justice Hedges
and Justices Yates and Seymore.

 









[1]
See Tex. Civ. Prac. & Rem. Code §§ 74.001–.507.