Stephen EARLE, M.D., Petitioner,

v.

Michael RATLIFF and Shirley
Ratliff, Respondents.

No. 98–0115.

Supreme Court of Texas.

Argued April 7, 1999.

Decided July 1, 1999.

Rehearing Overruled Oct. 7, 1999.

George H. Spencer, Sr., Phylis J. Speedlin, San Antonio, for Petitioner.

Donna J. Bowen, Michael L. Slack, Austin, James A. Hall, San Antonio, for Respondents.

Justice HECHT delivered the opinion of the Court.

This medical malpractice case raises several issues, but our attention centers on whether the plaintiff's claim that the defendant negligently performed surgery on him is barred by limitations. The plaintiff contends that limitations did not begin to run on his claim until his post-surgical course of treatment by the defendant ended, and until he became aware that the defendant had fraudulently concealed from him the truth about the surgery and the treatment that followed. Further, the plaintiff asserts, to bar his claim would violate the Open Courts provision of the Texas Constitution.[1] On each of these matters we disagree with the plaintiff, but on other claims described below, we believe the plaintiff is correct. The district court granted defendant summary judgment on all plaintiff's claims. The court of appeals reversed summary judgment on all claims.[2] We partially affirm, and partially reverse, the judgment of the court of appeals and remand the case to the district court for further proceedings.

## I

Michael Ratliff, a thirty-eight-year-old freight handler in good health, sustained a work-related back injury in June 1991, for which he was treated by Dr. Stephen Earle. On November 21, 1991, Earle operated on Ratliff, fusing his lumbar spine at three levels, decompressing nerves at four levels, and inserting metal bone plates and screws manufactured by AcroMed Corporation. Unfortunately, Ratliff's condition gradually worsened. Earle continued to treat Ratliff, and on November 16, 1993, Earle operated again to remove and replace the instrumentation implanted in the first surgery. Following this surgery, Ratliff's condition deteriorated even further, to the point where he was in constant

pain and unable to walk, talk, or care for himself. A month later, Ratliff saw a television report on the risks associated with the AcroMed instrumentation that had been surgically implanted in him and removed. Ratliff contends that this was his first inkling that Earle's treatment had been improper. Ratliff returned to Earle on January 4, 1994, for a final visit, and not quite two months later, on February 28, he and his wife (collectively, "Ratliff") sued Earle and others. We are concerned only with Ratliff's action against Earle.

Ratliff sued Earle for negligence, fraudulent concealment, strict liability, and violations of the Deceptive Trade Practices–Consumer Protection Act.[3] Ratliff alleged that Earle was negligent in:

- misdiagnosing his condition;
- performing unwarranted and unnecessary surgeries on him;
- implanting in his back pedicle devices not approved by the Federal Food and Drug Administration;
- failing to warn him of the risks of the surgery and the causes of his subsequent pain; and
- misrepresenting throughout the entire course of treatment the risks of pedicle instrumentation and the problems experienced by other patients from such a procedure.

Ratliff further alleged that Earle had fraudulently concealed:

- that the surgeries were unwarranted and unnecessary;
- that objective reports did not support Earle's diagnosis and recommendation of surgery;
- that statements Earle made to induce Ratliff to have surgery were incorrect;
- that assurances Earle gave Ratliff about his condition and the reasons

---

1. TEX. CONST. art. I, § 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.").

2. 961 S.W.2d 591.

3. TEX. BUS. & COM.CODE §§ 17.41–.63.

for his continuing pain were misleading, incomplete, and inaccurate; and

- the risks of using spinal fixation devices, some of which were printed on an insert in the packaging of the instrumentation Earle implanted in Ratliff.

Finally, Ratliff alleged that Earle violated the DTPA by telling him that:

- he needed surgery;
- he would get "95% better" and would be able to return to work;
- the devices implanted in Ratliff were safe, approved for such use, and permanent; and
- the pain he endured was to be expected and would get better.

(Ratliff has dismissed his strict liability claim in order to participate in a settlement reached in *In re Orthopedic Bone Screw Products Liability Litigation (Fanning v. Acromed Corp.)*.[4])

Earle moved for summary judgment on several grounds, including: that Ratliff's claims relating to his 1991 surgery were barred by limitations; that with respect to the 1993 surgery, Earle did not breach the standard of care owed Ratliff or cause him any injury; that Earle obtained from Ratliff the consent to treatment and surgery required by statute;[5] and that Earle did not knowingly make any misrepresentation to Ratliff. In connection with the last ground, Earle argued that Ratliff's health care liability claims could not be recast as DTPA violations. Earle supported his motion with his own affidavit and certain medical records. Ratliff responded, relying on his own affidavit and that of an expert witness, Dr. Vert Mooney, as well as other medical records. The district court granted Earle's motion "on all grounds", and Ratliff appealed.

The court of appeals reversed, holding that Earle was not entitled to summary judgment on any ground raised in his motion.[6] Concerning limitations, the court concluded "that the allegations of this case [involving] elements of both misdiagnosis and mistreatment mak[e] it difficult to ascertain a specific date when the malpractice claim arose."[7] Under the circumstances, the court found that limitations did not begin to run on Ratliff's claims until the date of Earle's last treatment,[8] which, as we have said, was less than two months before Ratliff filed suit.

We granted Earle's petition for review.[9] We first consider whether Ratliff's claims relating to the 1991 surgery are barred by limitations, and then whether Earle was entitled to summary judgment on Ratliff's other claims.

## II

Ratliff's negligence claims are "health care liability claims" within the meaning of the Medical Liability and Insurance Improvement Act.[10] Section 10.01 of the Act provides in pertinent part that

no health care liability claim may be commenced unless the action is filed within two years from the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or the hospital-

4. 176 F.R.D. 158, 165–166 (E.D.Pa.1997).

5. Tex.Rev.Civ. Stat. Ann. art. 4590i, §§ 6.05–.06 (Vernon Supp.1999).

6. 961 S.W.2d 591.

7. *Id.* at 597.

8. *Id.*

9. 42 Tex. Sup.Ct. J. 335 (Feb. 4, 1999).

10. "'Health care liability claim' means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury to or death of the patient, whether the patient's claim or cause of action sounds in tort or contract." Tex.Rev.Civ. Stat. Ann. art. 4590i, § 1.03(4) (Vernon Supp.1999).

ization for which the claim is made is completed.... [11]

Thus, under this statute limitations is to run from one of three dates: the date of the breach or tort, the completion of treatment, or the completion of hospitalization. We have repeatedly held that a plaintiff cannot choose the most favorable of the three dates specified, and that "if the date of the negligence can be ascertained, ... limitations must be measured from the date of the tort." [12]

Ratliff contends, and the court of appeals agreed, that limitations did not begin to run on his claims regarding the 1991 surgery until Earle quit treating him, shortly before he filed suit. Earle asserts that limitations began to run on those claims the date surgery was performed. Ratliff also contends that the running of limitations was suspended by Earle's fraudulent concealment of certain facts about the surgery and his prognosis. Earle responds that Ratliff has failed to raise a genuine issue of material fact on the elements of fraudulent concealment. Finally, Ratliff argues that his claims cannot be barred by limitations without violating the Open Courts provision of the Texas Constitution. Earle responds that Ratliff has failed to raise a fact issue that he did not have a reasonable opportunity to sue, and thus he is not entitled to the protection of the Open Courts provision. We address each of these issues—when limitations began to run, fraudulent concealment, and Open Courts—in turn.

### A

■ Ratliff neither complains nor offers evidence of any negligence by Earle in the treatment following the 1991 surgery. Ratliff does not contend, for example, that Earle should have done something after the surgery to relieve his pain or improve his back. Ratliff alleges that Earle did not tell him the truth about the surgery, the reasons for his continued pain afterward, or his prognosis, but he does not assert that Earle's alleged post-surgical statements or concealments affected his treatment or his condition.

Rather, Ratliff contends that Earle was negligent in misdiagnosing the need for surgery, in failing to disclose the attendant risks of surgery beforehand, and in performing unwarranted surgery. Assuming Ratliff is correct, Earle's negligence occurred on or before the date he performed surgery, and limitations on Ratliff's claim began to run on that date. We reached the same conclusion in similar circumstances in *Gormley v. Stover.*[13] There, Stover complained that Gormley was negligent in performing skin graft surgery to improve her ability to wear dentures, but she argued that limitations did not begin to run until Gormley quit treating her. We explained:

> Gormley's motion for summary judgment stated that the health care of which Stover complained occurred before or during surgery. None of the excerpts of Stover's and her expert witness' deposition testimony, attached to Gormley's motion, mentioned any negligence occurring after surgery. Gormley's affidavit stated that if Stover was injured at all, it was during surgery. Stover's affidavit did not assert that Gormley was negligent following surgery. Her affidavit did assert that Gormley represented to her after her surgery that her pain would shortly subside, but she does not claim that her continued pain was attributable to his post-surgical treatment of her. In short, Gormley's affidavit established as a matter of law that no actionable negligence occurred after surgical treatment was completed, and nothing else in the

---

11. *Id.* § 10.01.

12. *Husain v. Khatib,* 964 S.W.2d 918, 919 (Tex.1998) (per curiam); *accord Bala v. Maxwell,* 909 S.W.2d 889, 891 (Tex.1995) (per curiam); *Kimball v. Brothers,* 741 S.W.2d 370, 372 (Tex.1987).

13. 907 S.W.2d 448 (Tex.1995) (per curiam).

summary judgment record raises a fact issue on the matter. The trial court correctly granted summary judgment for Gormley on Stover's negligence claims in their entirety.[14]

As far as we have been able to determine, the only courts of appeals to consider this issue have reached the same conclusion.[15]

The court of appeals in the present case was concerned about the lingering effects of Earle's alleged misdiagnosis, leading to unnecessary surgery, continued pain and complications, and finally another surgery. But if the running of limitations on negligent surgery were deferred while the patient continued to experience the effects of that surgery, then the first clause of section 10.01 pegging the date of the breach or tort as the beginning of the limitations period would seldom apply to surgery.

Our conclusion does not suggest that limitations is not affected when a physician who can correct a misdiagnosis or lessen its consequences fails to do so. On the contrary, we suggested in *Rowntree v. Hunsucker* that a claim for continued mistreatment is not barred simply because treatment was based on a much earlier misdiagnosis.[16] *Rowntree* did not present such a situation,[17] but *Chambers v. Conaway*,[18] the case on which the court of appeals relied, did. Conaway claimed that Chambers, her family physician, failed to diagnose cancer on two occasions when she complained of a lump in her breast and on several other visits to him for general health care. Based on evidence that Chambers had a duty to follow up on Conaway's complaints each time he saw her, we held that the tort Conaway com-

plained of did not occur, and limitations did not begin to run, until the last time Chambers failed to diagnose her cancer, which was her last visit.[19] We did not apply the course-of-treatment limitations provisions of section 10.01 to allow Conaway to complain of the initial misdiagnosis, but neither did we allow that first misdiagnosis to bar Conaway's complaints about later visits.

Nor does our conclusion suggest that limitations on claims of post-surgical negligence runs from the date of surgery. If treatment is negligent following surgery, then section 10.01 provides that limitations begins to run from the date of the breach or tort or from the date that treatment was completed. Thus, limitations on a claim that a physician has improperly treated a patient's infection following surgery does not begin to run on the date of surgery merely because the infection would not have occurred but for the surgery.

Ratliff does not allege that Earle misdiagnosed or mistreated his condition after surgery or that he failed to do anything following surgery to rectify or ameliorate his earlier misdiagnosis that surgery was appropriate. Under these circumstances, limitations began to run on Ratliff's complaints concerning the 1991 surgery the date it was performed.

**B**

Although section 10.01 prescribes the limitations period for all health care liability claims "[n]otwithstanding any other

---

14. *Id.* at 449–450.

15. *See Winkle v. Tullos,* 917 S.W.2d 304, 310 (Tex.App.—Houston [14th Dist.] 1995, writ denied); *Desiga v. Scheffey,* 874 S.W.2d 244, 248–249 (Tex.App.—Houston [14th Dist.] 1994, no writ); *Shook v. Herman,* 759 S.W.2d 743, 745–746 (Tex.App.—Dallas 1988, writ denied). *Cf. Jones v. Cross,* 773 S.W.2d 41, 43 (Tex.App.—Houston [1st Dist.] 1989, writ denied) (holding that limitations began to run from the last date of treatment rather than the

date of the last of two eye surgeries because plaintiff alleged negligence in the follow-up treatment).

16. 833 S.W.2d 103, 105 (Tex.1992).

17. *Id.* at 108.

18. 883 S.W.2d 156 (Tex.1993).

19. *Id.* at 158–159.

law," [20] we held in *Borderlon v. Peck* that the statute "does not abolish fraudulent concealment as an equitable estoppel to the affirmative defense of limitations".[21] Proof of fraudulent concealment, we added, does not prohibit an assertion of limitations altogether, but does suspend the running of limitations until such time as the plaintiff learned of, or should have discovered, the deceitful conduct or the facts giving rise to the cause of action.[22] Ratliff contends that because Earle fraudulently concealed that the 1991 surgery was unnecessary and risky, limitations on claims concerning that surgery did not begin to run until he learned the truth in a television broadcast more than two years later, a few months before he filed suit.

■ We considered the effect of fraudulent concealment in the medical malpractice context in *Carrell v. Denton*.[23] There the defendant physician had left a gauze sponge in plaintiff's body after surgery. To avoid having his negligence claim barred by limitations, plaintiff asserted fraudulent concealment. We rejected plaintiff's argument, explaining:

> The proposition which lies at the bottom of this contention is to the effect that the relation between a surgeon and his patient involves trust and confidence, therefore fraudulent concealment is imputed to Dr. Carrell because of his failure to inform the plaintiff that the gauze sponge had been left inside the plaintiff's body. The proposition is essentially unsound. In conducting a surgical operation on his patient, and in respect to any treatment he may administer, a surgeon is under the duty to exercise due care. His failure to discharge this duty constitutes negligence and therefore is wrongful—but the failure does not, of itself, constitute fraud or expose the surgeon to the imputation of fraudulent concealment. Among other essential ingredients, a fraudulent concealment in cases of this sort includes, first, actual knowledge of the fact that a wrong has occurred, and, second a fixed purpose to conceal the wrong from the patient. Neither of these ingredients appears from the allegations of the plaintiff's petition. The trial court did not err in sustaining the special exception in question and in dismissing the suit.[24]

In other words, proof of fraudulent concealment requires more than evidence that the physician failed to use ordinary care; it also requires evidence that the defendant actually knew the plaintiff was in fact wronged, and concealed that fact to deceive the plaintiff.[25]

■ A person who asserts fraudulent concealment to avoid summary judgment on limitations must raise a genuine issue of material fact that would support his assertion.[26] Of course, fraudulent concealment may be shown by circumstantial evidence as well as direct evidence.[27] We therefore must examine the evidence Ratliff offered to support his claim of fraudulent concealment: Ratliff's affidavit and that of his expert, Dr. Mooney.

Mooney's affidavit focuses on whether Earle was negligent, not whether Earle deliberately concealed facts from Ratliff to deceive him. Mooney states that Earle

20. Tex Rev.Civ. Stat. Ann. art. 4590i, § 10.01 (Vernon Supp.1999).

21. 661 S.W.2d 907, 909 (Tex.1983).

22. *Id.; Nichols v. Smith,* 507 S.W.2d 518, 519 (Tex.1974).

23. 138 Tex. 145, 157 S.W.2d 878 (1942).

24. *Id.* at 879.

25. *See Borderlon,* 661 S.W.2d at 908 (holding that a physician has a duty to disclose a negligent act or the fact that an injury has occurred).

26. *Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 121 (Tex.1996) (per curiam); *American Petrofina, Inc. v. Allen,* 887 S.W.2d 829, 830 (Tex.1994).

27. *See Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986).

must have known that his recommendation of surgery was negligent because it was contraindicated by the objective test results set out in Ratliff's medical records and because information available to Earle concerning pedicle implementation showed that surgery should not have been attempted. While this evidence certainly shows a difference of opinion between Mooney and Earle and raises a question whether Earle was negligent, it falls short of showing Earle's "actual knowledge of the fact that a wrong ... occurred" necessary for fraudulent concealment. In addition, Mooney refers to portions of Earle's deposition testimony as evidence that Earle knew about, but did not inform Ratliff of, certain serious risks associated with spinal fixation surgery. This testimony, too, reflects a difference of professional opinion and does not show that Earle intended to deceive Ratliff.

Ratliff's affidavit does not show that Earle fraudulently concealed facts from him. Ratliff states that Earle "assur[ed] me that I would be '95% better' and would return back to work soon", that Earle "did not inform me that my surgery could make my condition even worse" and "never explained the permanency and severity of my condition", and that Earle "told me the [1993] surgery was necessary because I had four broken screws" when in fact the surgery was necessitated by loose, not broken, screws. But Ratliff offers no evidence, direct or circumstantial, that Earle actually knew these statements were in fact false when he made them, let alone that Earle's purpose in making them was deceit. Earle may have been negligent in what he said to Ratliff, just as he may have been negligent in performing the 1991 surgery, but Ratliff has offered no summary judgment evidence that Earle acted fraudulently by concealing a known wrong.

Because Ratliff has failed to raise an issue of fact concerning fraudulent concealment, we conclude that he cannot thereby avoid the bar of limitations.

### C

■■■ The Open Courts provision of the Texas Constitution[28] does not permit a well-established common-law cause of action to be restricted by statute in a way that is unreasonable or arbitrary in view of the statute's purpose.[29] In *Jennings v. Burgess*, we held that the limitations provisions of section 10.01 do not violate the Open Courts guarantee if a plaintiff has had a reasonable opportunity to discover the alleged wrong and bring suit before the limitations period expired.[30] We assumed in *Jennings*, without expressly explaining our reasons, that the plaintiff must raise a fact issue concerning the applicability of the provision to avoid a summary judgment on limitations.[31] We believe that the same rule should apply for asserting the Open Courts guarantee in response to a motion for summary judgment on limitations as is applied in asserting fraudulent concealment.

Ratliff's affidavit establishes that he did not learn of the risks of pedicle implantation until he saw a television broadcast about a month after his second surgery. However, the only evidence Ratliff has offered to show that he could not have learned of the risks sooner consists of statements in Mooney's affidavit that he was justified in trusting Earle and the following statement: "From the information that I have reviewed, there is no evidence that Mr. Ratliff could have known that his care and continued treatment by Dr. Earle was negligent and had caused the problems he was experiencing until, at the earliest, in December 1993 when he saw the [television broadcast]." The district court correctly struck this latter

**28.** TEX. CONST. art. I, § 13.

**29.** *See Diaz v. Westphal*, 941 S.W.2d 96, 100 (Tex.1997).

**30.** 917 S.W.2d 790, 794 (Tex.1996).

**31.** *See id.*

statement as being conclusory. Even if the sentence had not been struck, neither it nor Mooney's broad statements about justified reliance on a physician's advice would support Ratliff's constitutional claim. Mooney's statement that *he* had seen no evidence that Ratliff could have discovered Earle's alleged negligence sooner is not conclusive of the record. Between the 1991 and 1993 surgeries, Ratliff made twenty-four visits to Earle's office. Medical records establish that he repeatedly complained of pain and a lack of improvement in his condition. In his own affidavit, Ratliff reiterates that his pain persisted during that period and that there was little improvement in his condition. Ratliff's condition was not latent, nor does he assert that the risks associated with his surgery were generally unknown to medical practitioners.

The record establishes that Ratliff had an opportunity to learn of any negligence by Earle in performing the 1991 surgery, and the fact that he waited more than two years to do so does not raise constitutional concerns. Accordingly, we conclude that Ratliff's claims concerning the 1991 surgery are barred by limitations.

### III

We now turn to three additional claims Ratliff makes: that Earle was negligent in performing the 1993 surgery, that Earle failed to disclose the risks attendant to that surgery, and that statements Earle made violated the DTPA.

### A

■ Ratliff claims that Earle was negligent in performing the 1993 surgery. In his affidavit supporting his motion for summary judgment, Earle states that he did not breach the applicable standard of

care in performing the 1993 surgery. "Both in 1991 and 1993," Earle's affidavit states, "use of Steffe pedicle screws and plates met the standard of care." Mooney's affidavit states with respect to the 1993 surgery: "Considering the degree of spinal instability created by Mr. Ratliff's first surgery, and the fact that Mr. Ratliff's first set of AcroMed screws and plates resulted in hardware failure with loosening, the insertion of another device was medically unwarranted." The district court struck this statement in Mooney's affidavit as being conclusory, but we do not regard it as any more conclusory than statements in Earle's affidavit. Mooney's statement raises the question whether, given Ratliff's failure to improve following the first surgical implantation and his increased spinal instability, a second implant was warranted. Earle's affidavit and other summary judgment evidence do not address this issue.

■ Summary judgment can be granted on the affidavit of an interested expert witness, like Earle, but the affidavit must not be conclusory.[32] An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts.[33] Earle's affidavit does not explain why implantation of additional devices in the 1993 surgery was medically warranted, given Ratliff's history; the affidavit states only the conclusion that Earle met the applicable standard of care.

Accordingly, the court of appeals did not err in reversing summary judgment on this claim.

### B

■ Ratliff contends that Earle was negligent in failing to disclose the risks attendant to the 1993 surgery. This claim

---

**32.** *Anderson v. Snider,* 808 S.W.2d 54, 55 (Tex.1991) (per curiam).

**33.** *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726–727 (Tex.1998) (quoting *General Elec. Co. v. Joiner,* 522 U.S. 136, 146,

118 S.Ct. 512, 523, 139 L.Ed.2d 508 (1997); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711–712 (Tex.1997); *Schaefer v. Texas Employers' Ins. Ass'n,* 612 S.W.2d 199, 202–204 (Tex.1980)).

is governed by the Medical Liability and Insurance Improvement Act.[34] The Act creates the Texas Medical Disclosure Panel and gives it the responsibility to "identify and make a thorough examination of all medical treatments and surgical procedures ... to determine which ... do and do not require disclosure of the risks and hazards to the patient".[35] The Panel prepares and publishes two lists, one (List A) of treatments and procedures for which the risks must be disclosed, and the other (List B) of treatments and procedures for which disclosure of risks is not required.[36] For all List A procedures, the Panel must also state what risks must be disclosed and the form in which disclosure must be made.[37] The Act then provides that a physician who discloses to a patient the risks of a List A procedure in the substance and form prescribed by the Panel "shall be considered to have complied" with the Act,[38] and that a patient's consent to a List A procedure obtained as prescribed "shall be considered effective".[39] It is undisputed that both of Ratliff's surgeries were List A procedures.[40] Earle's affidavit states in effect that he disclosed all risks identified by the Texas Medical Disclosure Panel in the manner required, and Ratliff's signed consent form shows that Earle is correct.

 The court of appeals held, however, that Earle's affidavit only raised a rebuttable presumption that he was not negligent in disclosing the risks of surgery to

Ratliff, a presumption Ratliff could and did rebut with Mooney's affidavit stating that Earle should have disclosed certain risks beyond those enumerated by the Texas Medical Disclosure Panel.[41] The court relied on another court of appeals' decision, *Penick v. Christensen,*[42] which concluded that a physician who makes disclosure for a List A procedure or treatment as prescribed by the Panel can nevertheless be negligent for failing to make additional disclosures. *Penick* based its conclusion on section 6.07(a)(1) of the Act, which provides that disclosure made as prescribed for a List A procedure "shall create a rebuttable presumption that the requirements of [the Act] have been complied with".[43]

We do not agree that the Act permits a finding that a physician who made disclosures as prescribed by the Panel was negligent for not disclosing other risks and hazards associated with the recommended procedure. Were it so, the Act would afford a physician who complied with Panel directives no protection from liability for nondisclosure if there were any evidence that additional disclosure was appropriate. The entire purpose of the Panel decisions would thus be thwarted. Section 6.07(a)(1) is not entirely clear, but we agree with the weight of scholarly authority that, read in the light of the other provisions of the Act, it permits the presumption of proper disclosure to be rebutted only by showing the

---

34. TEX REV. CIV. STAT. ANN. art. 4590i, §§ 6.01–.08 (Vernon Supp.1999).

35. *Id.* § 6.04(a).

36. *Id.* § 6.04(b), (c).

37. *Id.* § 6.04(b).

38. *Id.* § 6.05.

39. *Id.* § 6.06.

40. The Texas Medical Disclosure Panel lists "spine operation" as a procedure requiring written disclosure, and defines the procedure as including "laminectomy, decompression,

fusion, internal fixation or procedures for nerve root or spinal cord compression". 25 TEX. ADMIN. CODE § 601.2(m)(3) (1998). The Panel has identified six risks which must be disclosed prior to a spine operation: "pain, numbness or clumsiness", "impaired muscle function", "incontinence or impotence", "unstable spine", "recurrence or continuation of the condition that required the operation", and "injury to major blood vessels". *Id.*

41. 961 S.W.2d at 597.

42. 912 S.W.2d 276, 285–286 (Tex.App.— Houston [14th Dist.] 1995, writ denied).

43. TEX.REV.CIV. STAT. ANN. art. 4590i, § 6.07(a)(1) (Vernon Supp.1999).

invalidity of the consent form, such as by proof that the patient's signature was forged, or that the patient lacked capacity to sign.[44]

Ratliff produced no evidence that his written consent was ineffective due to incapacity or was otherwise invalid, and thus he has raised no issue that Earle was negligent in disclosing the risks of surgery. Accordingly, we hold that the court of appeals erred in reversing summary judgment on this claim, and we disapprove *Penick* to the extent its reasoning is contrary to ours.

## C

▬ Finally, Ratliff claims that Earle misrepresented and concealed the truth concerning both the 1991 and the 1993 surgeries in violation of the DTPA. Section 12.01(a) of the Medical Liability and Insurance Improvement Act precludes application of the DTPA to physicians "with respect to claims for damages for personal injury or death resulting, or alleged to have resulted, from negligence".[45] Ratliff and Earle both argue whether Ratliff's DTPA claims are thus precluded.

In *Sorokolit v. Rhodes*, we held that section 12.01(a) does not preclude a DTPA claim that is not based on a physician's breach of the accepted standard of medical care.[46] We added, however, that "[c]laims that a physician or health care provider was negligent may not be recast as DTPA actions" to avoid the provisions of the Act.[47] We held that a physician's promise that his patient's appearance following cosmetic surgery would be identical to a specific photograph was actionable under the DTPA.[48]

In *Gormley v. Stover*, however, we held that a dentist's statements that he could perform surgery on the plaintiff with no problems, that a skin graft would work as well as a bone graft, that after surgery the plaintiff could wear dentures with no problems, and that her pain and numbness would subside following surgery were not actionable under the DTPA.[49] All these statements, we concluded, related to whether the dentist's choice of surgical procedure and his performance of it met the applicable standard of care.[50] In *Walden v. Jeffery*, we held that a dentist's failure to provide the plaintiff dentures that fit was a negligence claim, not a DTPA claim.[51] More recently, we held in *MacGregor Medical Ass'n v. Campbell*

---

44. *See* Jim M. Perdue, *The Law of Texas Medical Malpractice, Chapter X: Informed Consent,* 22 Hous. L. Rev. 399, 426 n. 190 (1985) (observing "[t]here appears to be no avenue for disputing th[e] presumption" of sections 6.05 and 6.06, that written disclosure of the panel's enumerated risks is sufficient for List A procedures); Frank W. Elliott, *The Impact of the Texas Medical Liability and Insurance Improvement Act on Informed Consent Recovery in Medical Malpractice Litigation,* 10 Tex. Tech L. Rev. 381, 387 (1979)("[I]t appears that evidence that could rebut the presumption of disclosure under Section 6.07(a)(1) is evidence that would attack the validity of the consent."); Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges—Malpractice, Premises & Products PJC 51.15, cmt. (1997) ("If the physician has obtained the patient's signature on a consent form ... containing the risks enumerated on list A, the only means by which the patient may recover for failure to obtain informed consent is to prove the invalidity of the form and that the risks had not otherwise been disclosed to

him."); *see also Crundwell v. Becker,* 981 S.W.2d 880 (Tex.App.—Houston [1 st Dist.] 1998, pet. denied) (holding that the trial court's directed verdict on an informed consent claim was not error when the patient who signed the consent form offered no evidence of incapacity).

45. Tex.Rev Civ. Stat. Ann. art. 4590i, § 12.01(a) (Vernon Supp.1999).

46. 889 S.W.2d 239, 242 (Tex.1994).

47. *Id.*

48. *Id.* at 242–243.

49. 907 S.W.2d 448, 449–450 (Tex.1995) (per curiam).

50. *Id.* at 450.

51. 907 S.W.2d 446, 447–448 (Tex.1995) (per curiam).

that a clinic's statements in its HMO literature that it provided qualified personnel and resources, the best services possible, and emergency service twenty-four hours a day were not actionable under the DTPA when the plaintiff's complaint was that her deceased husband had been negligently treated.[52]

The representations Ratliff alleges Earle made are all related to Earle's treatment of him and the surgeries performed, as in *Gormley, Walden,* and *MacGregor,* and do not resemble the representations that were possible DTPA violations in *Sorokolit.* The gist of all of Ratliff's claims, variously phrased and labeled, is that Earle did not hold to the applicable standard of care. Such a claim sounds only in negligence. Summary judgment on these claims was therefore proper.

\* \* \* \* \*

Accordingly, the court of appeals' judgment is affirmed in part and reversed in part, and the case is remanded to the district court for further proceedings.

---

**52.** 985 S.W.2d 38, 40–41 (Tex.1998) (per cu- riam).