NO. 07-10-0060-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

NOVEMBER 22, 2011

_____

WALTER C. BROGAN, III, M.D.,

Appellant

v.

DIANE BROWNLEE,

Appellee

_____

FROM THE 99TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2007-539,760; HON. WILLIAM C. SOWDER, PRESIDING

_____

*Opinion*

_____

Before QUINN, C.J., and CAMPBELL and PIRTLE, J.J.

Walter C. Brogan, III, M.D. (Brogan) appeals from a judgment rendered in favor of Diane Brownlee (Brownlee) after a jury found he committed medical malpractice. Though he presents three issues for review, we need only address the first for it is dispositive. It concerns the legal and factual sufficiency of the evidence underlying the finding of causation between the doctor's negligence and the injury for which his patient sought damages. We reverse and render.

*Background*

Brownlee underwent a cardiac catheterization (cath) at the hands of Brogan and via her femoral artery. Upon completing the procedure, he attempted to close the incision into the artery with a stitch administered by a perclose device. His effort, though, resulted in the top and bottom of the artery being sown together. Some evidence illustrates that the artery was not completely closed because she continued to have a pulse in or around her foot; we were told that approximately 30% of the passage remained open. Nonetheless, the flow of blood through the artery was reduced as exemplified by her leg 1) becoming pale and cool to the touch below the knee, 2) cramping, and 3) experiencing slower capillary fill. Additionally, a blood clot formed at the site of the stitch sometime after the latter's installation, though no one could specify an exact time at which it did. This clot further reduced blood flow through the artery.

Surgery the following day resulted in the removal of the obstruction. By then, though, Brownlee's femoral nerve had been permanently injured due to ischemia, or the loss of blood to the area resulting in the death of tissue. No one disputes that. Nor does anyone dispute that the sole injury she suffered (or at least for which she eventually sued) consisted of damage to that nerve. What is at issue, however, concerns the point at which the permanent injury came to fruition. The answer to that question was of utmost importance given the nature of Brownlee's cause of action underlying her attempt to recover damages and the time of its accrual.

Due to the nature of her cause of action, the jury was not asked to determine whether Brogan was negligent in closing the artery as he did. Rather, it was asked to assess whether he was negligent in failing to reasonably respond once he gained

2

information suggesting that something was wrong with the quantum of blood flowing to his patient's leg. All agree that such information was imparted to him via a telephone call from a nurse at approximately 6:30 p.m., or about three hours after the cath procedure was completed. Furthermore, the information imparted consisted of her disclosing to Brogan the aforementioned symptoms regarding Brownlee's leg being pale and cool to the touch below the knee, cramping, and experiencing slower capillary fill. Instead of examining her at that time, Brogan opined that she was having a vascular spasm, directed the nurse to monitor the patient, and granted permission to have her released from the hospital should the situation improve.

That Brogan was available to visit his patient before her release was undisputed. Similarly conceded by all litigants was that procedures and devices were available at the hospital which could have been used to uncover the obstruction in the artery before her release. Nor does anyone question the evidence that Brownlee showed signs of suffering from ischemia in her leg before anyone notified Brogan.

Because Brownlee's condition improved somewhat at the hospital, she was released. Yet, it began to again deteriorate after she arrived home. Though she tried to see Brogan early the next day, he was unavailable for a number of hours. But, as previously mentioned, the obstruction was eventually diagnosed, and surgery resulted in its removal.

*Law and Its Application*

Again, we only address Brogan's issue regarding the existence of evidence supporting the jury's verdict. The jury concluded that 1) Brogan was negligent in failing to reasonably attend to Brownlee upon being told of her symptoms at 6:30 p.m. and 2)

3

his negligence proximately caused permanent injury to her femoral nerve. Brogan does not attack the finding of negligence on appeal. Rather, he questions whether Brownlee established the element of causation, that is, whether his unreasonable delay in responding proximately caused the nerve to die in part.

The pertinent standard of review is discussed in *Jelinek v. Casas*, 328 S.W.3d 526 (Tex. 2010) and *City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005). We refer the litigants to those opinions.

Next, not everything heard by a jury is evidence. For instance, comments or argument made by attorneys during trial generally fall outside that category. *Love v. Moreland*, 280 S.W.3d 334, 336 n.3 (Tex. App.–Amarillo 2008, no pet.). Conclusory statements made by experts do so as well. *See Jelinek v. Casas*, 328 S.W.3d at 539-40; *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999). According to the *Jelinek* court, "[a]n expert's conclusion that 'in medical probability' one event caused another differs little, without an explanation tying the conclusion to the facts, from an *ipse dixit*, which we have consistently criticized." *Jelinek v. Casas,* 328 S.W.3d at 539. The "expert must go further and explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented." *Id* at 539-40. We were similarly told in *Earle* that an "expert's simple *ipse dixit* is insufficient to establish a matter" and "rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Earle v. Ratliff*, 998 S.W.2d at 890. So, to be considered probative evidence, expert opinions must be explained through the use of and supported by evidence. *Id.* Otherwise, they are *ipse dixit* and of no worth. *Id.* And, therein lies the problem here.

Given the nature of the negligence claims submitted to the jury, Brownlee's recovery was dependent upon her establishing that Brogan's misfeasance (*i.e.* failure to reasonably respond to the situation made known to him at 6:30) caused at least some of the injury to her nerve. If her injury either pre-existed his delay or was not otherwise enhanced by it, there can be no causal link between the negligence and harm. Simply said, acts occurring at 6:30 cannot, as a matter of law and logic, be said to have spawned injuries that arose before 6:30. And as for the evidence establishing the requisite link, we find none here.

No evidence of record exists upon which a rational trier of fact could legitimately infer that Brownlee's femoral nerve was injury free before Brogan was contacted at 6:30. Rather, no expert denied that 1) blood flow through the femoral artery was obstructed upon the administration of the perclose device, 2) the potential for injury arose once the flow was reduced, and 3) the specific time at which the clot formed was unknown. Nor could the experts opine about whether the clot had formed before or after Brogan received the 6:30 call. Additionally, we neither found nor were cited to any evidence of record explaining 1) by what amount the blood flow had to be reduced before Brownlee's femoral nerve would begin suffering injury, 2) whether injury to her nerve could arise simply from the obstructed flow caused by the sutured artery or whether the presence of a clot was also necessary, 3) whether her nerve incurred any trauma before the 6:30 call to Brogan, 4) whether any trauma to her nerve arose after the 6:30 call, 5) whether there could have been no trauma to it before the 6:30 call, or 6) whether the nerve damage was complete by 6:30. We know there was trauma. We know that the trauma began after Brogan finished the cath. We know the trauma was

5

linked to the reduction in flow through the femoral artery.  We know that Brownlee was exhibiting signs of ischemia in her leg before 6:30.  We know that nerves are one of the first body parts to be affected by a reduction in blood flow.  However, we do not know, and have not been cited to any evidence illustrating, whether the trauma to her femoral nerve was complete or permanent before or after Brogan received that 6:30 call.

To the extent several experts merely opined that Brownlee's "injury" would not have been "permanent" or as "substantial" had the doctor acted timely after 6:30, those comments do not fill the void.  None of the experts espousing them alluded to any evidentiary basis for making those statements.  None attempted to explain for the jurors how they derived those opinions.  Instead, they either conceded to not knowing when the injury actually began or were not asked to explain when it became permanent.

That one or more of the experts alluded to the injury as being "continuous" also is of no legal substance.  While one of the experts did state that Brownlee encountered "continuous injury" because "she went from pain to paresthesia," he nonetheless refused to suggest that the injury happened the morning after the cath when pressed on the issue of when the patient actually "experience[d] injury to the femoral nerve." Rather, he told the jury that she "could have experienced injury to the femoral nerve from the time that she was in the hospital," which happened to be before and after 6:30. Then he conceded that "I don't know that answer."  As for his opinion that the patient "would not have *a significant permanent injury*" had Brogan timely seen her after 6:30, the utterance falls short of suggesting that she would have been injury free.  Indeed, it insinuates that she would have suffered some type of permanent injury irrespective of what Brogan did, and more importantly, it fails to distinguish between the permanent

6

injury she did suffer and the permanent injury she would have suffered if no misfeasance occurred. Being bereft of all factual explanation, those comments were just *ipse dixit* too.

In sum, what we have before us is evidence of a permanent injury to Brownlee's femoral nerve. What we do not have before us is any evidence of what portion of the injury occurred before or after Brogan's duty of care was triggered. The burden lay with her to prove that once the doctor breached the duty of care arising with the 6:30 phone call, that breach then caused some ensuing injury. Yet, the appellate record leaves us guessing at that. There is definitely evidence of injury to the nerve, but what portion of that injury, if any, occurred after Brogan breached his duty of care is unknown. And, that circumstance requires us to hold that Brownlee failed to present some evidence from which the jury could reasonably find proximate causation between the breached duty and a resulting injury.

Accordingly, we sustain Brogan's first issue. Having done so not only relieves us from the obligation to address his remaining two complaints but also requires us to reverse the trial court's judgment and render judgment denying Brownlee recovery against Brogan.


Brian Quinn
Chief Justice

Pirtle, J., dissents.

7