

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-15-00430-CV

GENE NELSON, APPELLANT

V.

JOSEPH L. MARTINEZ, M.D. AND NEUROSURGICAL ASSOCIATES, LLC, APPELLEES

On Appeal from the 72nd District Court
Lubbock County, Texas
Trial Court No. 2014-511,449, Honorable Ruben Gonzales Reyes, Presiding

July 12, 2016

MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Gene Nelson (Nelson) appeals from a summary judgment denying him relief against Joseph L. Martinez, M.D. and Neurosurgical Associates, LLC (collectively referred to as Martinez). Nelson sued Martinez for medical malpractice arising from a back operation. As part of that operation, Martinez inserted screws into the lumbar region of Nelson's spine. A screw inserted in vertebrae L-5 apparently "breached" or pierced through the pedicle (that is, a portion of the vertebrae) and contacted or caused

contact with a nerve. This resulted in Nelson suffering from foot drop or a paralysis of his foot. Upon being sued, Martinez moved to strike aspects of the evidence Nelson purported to offer. So too did he file a no evidence motion for summary judgment. The trial court granted both motions, and Nelson appealed. Through this appeal he contends that the trial court erred in granting both motions. We affirm.

*Background*

Nelson itemized the purported acts of misfeasance and nonfeasance committed by Martinez via the third amended petition or live pleading. They consisted of 1) "[i]n the original surgery . . . placing the right L4 and L5 pedicle screws medially from where they should have been placed without recognizing that the screws were malpositioned"; 2) "[i]n failing to recognize that the intraoperative images taken on October 9, 2012, immediately after screw placement, revealed incorrect anatomical alignment and that neurological injury would result if not repositioned"; 3) "[i]n failing to reposition the misplaced pedicle screws by placing the misplaced pedicle screws in different fixation points before completing the original surgery"; 4) "[i]n failing to rule out pedicle screw malpositioning with a CT scan the day after surgery when [Nelson] complained of right foot weakness and pain"; and 5) "[i]n waiting too long to request a CT scan after [Nelson] complained of right foot weakness and pain." Also alleged was that "Martinez was required to use his best efforts in positioning the pedicle screws" and "[h]is duty included guarding against foreseeable consequences of a lumbar nerve injury if incorrectly placed screws were allowed to put pressure on the nerve root."

Nelson retained Dr. Lukas Zebala as his medical expert. Zebala's deposition was taken, and he also executed affidavits through which he voiced his opinions as to

the negligence committed by Martinez. The latter objected to them. So too did he move to strike the opinions regarding causation because they supposedly were "speculative, *ipse dixit* and not predicated on a proper factual foundation, [which] render[ed] the opinions unreliable and inadmissible."

Eventually, Martinez sought a no evidence summary judgment. Through it, he contended that there was no evidence indicating 1) he "was negligent in his care of . . . Nelson, at any time prior to or during the placement of the pedicle screws during the surgery . . . ," 2) his "alleged failure 'to recognize that the intraoperative images taken immediately after screw placement revealed incorrect anatomical alignment and that neurological injury would result if not repositioned' proximately caused [Nelson's] foot drop or any other injury, harm or damages," 3) his "alleged failure 'to reposition the misplaced pedicle screws by placing the misplaced pedicle screws in different fixation points before completing the original surgery' proximately caused [Nelson's] foot drop or any other injury, harm or damages," 4) his "alleged failure 'to rule out pedicle screw malpositioning with a CT scan the day after surgery when [Nelson] complained of right foot weakness and pain' proximately caused [Nelson's] foot drop or any other injury, harm or damages," and 5) his "alleged 'waiting too long to request a CT scan after [Nelson] complained of right foot weakness and pain' proximately caused [Nelson's] foot drop or any other injury, harm or damages." Nelson responded to the summary judgment motion. That led to Martinez objecting to other evidence proffered by his opponent. That evidence consisted of Nelson's testimony, the previously mentioned affidavit of Zebala, and various medical records.

3

The trial court granted not only the evidentiary objections uttered by Martinez but also the motion for summary judgment. The grounds upon which it relied, though, went unspecified.

*Issues*

Despite presenting us with two issues, we need only address one. It pertains to the entry of summary judgment. Simply put, Nelson asserts that there existed material questions of fact on each element of negligence, that is, duty, breach and proximate causation. In considering that argument, we assume *arguendo* that the trial court erred in sustaining Martinez' attacks upon Nelson's evidence, including the deposition and affidavit of Zabala. Thus, we will include such evidence in our analysis.

Next, we mention several rules pertinent to reviewing a decision to grant a no evidence motion for summary judgment in general and one pertaining to claims of medical malpractice in particular. First, we are to view the evidence of record in the light most favorable to the non-movant, "'crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not.'" *Gonzalez v. Ramirez*, 463 S.W.3d 499, 504 (Tex. 2015), *quoting, Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). Second, a no-evidence motion for summary judgment will be sustained if there is a complete absence of evidence of the vital fact at issue, rules of law or evidence bar the court from assigning weight to the only evidence offered to prove the vital fact, the evidence offered to prove that fact is no more than a scintilla, or the evidence conclusively establishes the opposite of the vital fact in play. *Merrell Dow Pharm, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). Third, more than a scintilla of evidence exists if the totality of evidence

4

supporting the vital fact enables reasonable and fair-minded jurors to differ in their conclusions. *Id.*; *Ptomey v. Texas Tech Univ.*, 277 S.W.3d 487, 493 (Tex. App.—Amarillo 2009, pet. denied). Fourth, evidence simply creating a surmise or suspicion of the vital fact's existence is not enough. *See Jelinek v. Casas,* 328 S.W.3d 526, 532 (Tex. 2010) (stating that where the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, that evidence is no more than a scintilla and, consequently, no evidence).

Fifth, there are several elements to a malpractice claim. To recover, one must prove that 1) the physician had a duty to act according to a certain standard; 2) the physician breached that particular standard or failed to act in accordance with it; 3) the plaintiff suffered injury; and 4) the breach of the standard proximately caused the resulting injury. *Schneider v. Haws*, 118 S.W.3d 886, 889 (Tex. App.—Amarillo 2003, no pet.). The "certain standard" to which we refer is one of ordinary or reasonable care. *Id.* at 890. That is, the physician need only do that which an ordinarily prudent physician would do under the same or similar circumstances. *Chambers v. Conaway*, 883 S.W.2d 156, 158 (Tex. 1993); *Creech v. Columbia Medical Center*, 411 S.W.3d 1, 6 (Tex. App.—Dallas 2013, no pet.). Our jurisprudence does not impose upon him some higher degree of care. *Schneider v. Haws*, 118 S.W.3d at 890.

Sixth, establishing the requisite standard of care, its breach, and the causative relationship, if any, between the breach and resulting injury normally requires expert testimony. *Creech v. Columbia Medical Center,* 411 S.W.3d at 6; *accord*, *Jelinek v. Casas*, 328 S.W.3d at 533 (stating that in medical negligence cases, expert testimony regarding causation is the norm and generally expert testimony is needed to establish

5

causation regarding medical conditions outside the common knowledge and experience of jurors); *Schneider v. Haws*, 118 S.W.3d at 892 (stating that while expert testimony is generally needed to determine whether a duty was breached in a medical malpractice case, "that is not a hard and fast rule" and "if the purported breach involves circumstances which a juror can analyze through application of common knowledge or experience, then the patient need not tender expert testimony explaining whether a breach occurred.")  Seventh, the expert testimony or opinions rendered must be more than conclusory before they can be deemed admissible evidence.  *Brogan v. Brownlee*, 358 S.W.3d 369, 371 (Tex. App.—Amarillo 2011 no pet.).  For instance, when discussing causation, the expert must explain to a reasonable degree how and why the breach caused the injury based on the facts present; his opinion "must be explained through the use of and supported by evidence."  *Id.*

Eighth, an expert's opinions about causation must also deal in reasonable medical probabilities; they must show the existence of a reasonable probability that the injuries in question were caused by the negligence of which the patient complains. *Jelinek v. Casas*, 328 S.W.3d at 532-33.  Mere "possibilities" is not enough.  *Insurance Co of Am. v. Myers*, 411 S.W.2d 710, 714 (Tex. 1966) (stating that "[p]roof of want of skill in malpractice suits must establish causal connection beyond the point of possibility by expert professional testimony.")  So too must those opinions illustrate that the ultimate harm "more likely than not" resulted from the purported misconduct.  *Jelinek v. Casas*, 328 S.W.3d at 532-33; *Kareh v. Windrum*, No. 01-14-00179-CV, 2016 Tex. App. LEXIS 4104, at *28 (Tex. App.—Houston [1st Dist.] April 19, 2016, no pet.).  If an opinion deals merely in possibilities as opposed to reasonable medical probabilities, it

falls within the realm of speculation and constitutes "no evidence." *Neufeld v. Hudnall*, No. 07-09-00350-CV, 2010 Tex. App. LEXIS 5601, at *8 (Tex. App.—Amarillo July 16, 2010, pet. denied) (mem. op.).

With the foregoing in mind, we turn to the case at hand. It encompasses two categories of purportedly wrongful conduct. One pertains to the initial positioning of the screws in Nelson's L-5 vertebrae. The other concerns the discovery that one or more of those screws were improperly positioned and the remediation of that circumstance. Neither party suggests that either of those instances involve matters within the common knowledge or experience of a juror or layperson. Nor do we believe such resides within that realm of knowledge or experience. So, whether the circumstances constituted negligence that proximately caused injury were matters dependent upon the presentation of expert opinions. And, again, Martinez sought summary judgment because Nelson had no evidence of negligence or proximate causation. That meant it was incumbent upon Nelson to proffer sufficient evidence to create material issues of fact on the applicable standard of care, its breach, and its causative relationship to the resulting injury.

Regarding the *initial insertion* of the screws, it is undisputed that they were "malpositioned," that such mal-positioning caused at least one screw to breach the pedicle, that breaching the pedicle affected a spinal nerve or nerve root in some way, and that Nelson suffered foot drop because the pedicle was pierced. And, upon hearing the prefix "mal" in reference to the way the screws were positioned, a layperson could easily jump to the conclusion that the act constituted a breach of a standard of care. Indeed, "mal" connotes bad or wrong. Yet, labels can be misleading especially when

7

used by a profession outside the common understanding of a layman. Instead, all was and is dependent upon proof from a competent medical expert that Martinez' actions failed to comport with the standard of care applicable to those conducting operations like the one Nelson underwent. According to Nelson, that proof came from the neurosurgeon who discovered the mal-positioning, the surgeon being Dr. Smith. Furthermore, it consisted of Smith stating that "[t]he placement of pedicle screws should always be the properly --should always be the main goal, understanding that *there's always a small but real chance that even when performed as best possible there's a risk of malposition.*" (Emphasis added). The statement came in response to the following utterance by Nelson's legal counsel: "I just want you to tell me *if you believe* that placement of pedicle screws is important that it be done correctly." Assuming *arguendo* that asking an expert if he "believed" something was "important" implicates the applicable standard of care, the ensuing response must be viewed within its context. *See City of Keller v. Wilson*, 168 S.W.3d 802, 812 (Tex. 2005) (involving a legal sufficiency or "no evidence" review and holding that "evidence cannot be taken out of context in a way that makes it seem to support a verdict when in fact it never did"); *Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681, 684-85 (Tex. 2004) (involving the review of a directed verdict which involves a standard of review akin to one applied when addressing no evidence summary judgments and concluding that the deposition excerpts were no evidence since they were "read out of context"). Nelson did not do that here.

We begin with Smith's observation that there was always a "real chance" of misplacing the screw even when its insertion is "performed as best as possible." He

8

also answered "yes" when asked if he was familiar with neurosurgical literature recognizing the incidence of pedicle screws going outside the pedicle "'one way or the other.'" According to the surgeon, that happens "despite using everything . . . available to us as neurosurgeons to try to keep them in the pedicle." And, when asked whether placing a pedicle screw "medially" (as occurred here) "doesn't mean" that "the neurosurgeon has done anything wrong," he replied: "Yes." "It's a known complication despite, you know, best efforts and best technology."[1]

In *Felton v. Lovett*, 388 S.W.3d 656 (Tex. 2012), our Supreme Court explained that:

> Health care gives few guarantees; usually there is a risk -- commonly defined as a 'chance of injury' -- even if treatment is proper and properly administered. Such a risk is inherent in health care. Other risks are extraneous. Malpractice, for example, is an extraneous risk, one that inheres in the practice of health care, not in the care itself. Thus, the inherent risks of surgery do not include the possibility that it may be based on an erroneous diagnosis or prognosis, or that it is negligently performed . . . . On the other hand, the risk that surgery may result in injury, *even if properly performed*, is inherent in the procedure itself. An example is cutting or traumatizing a nerve adherent to a lymph gland being biopsied. *Inherent risks of treatment are those which are directly related to the treatment and occur without negligence* . . . . They do include side effects and reactions, whether likely or only possible, that are directly related to the treatment provided.

*Id.* at 661-62 (emphasis added). Reading Dr. Smith's testimony in context leads to only one reasonable interpretation of what was being said. He is not suggesting that Martinez was negligent by breaching a particular standard of care. Rather, he was speaking of inherent risks and categorizing the injury encountered by Nelson when the screw was first inserted as such a risk. Again, striking the nerve due to the placement

---

[1] Nelson's own expert, Dr. Zebala, testified similarly via his deposition. This may be why he also admitted that his "criticism" of Martinez was not "that the screw at L-5 on the right ended up breaching the pedicle" but that Martinez "didn't figure it out sooner . . . ."

of the insertion of screws in the pedicle is "a known complication despite . . . best efforts and best technology." Inserting a pedicle screw "medially" "doesn't mean" that "the neurosurgeon has done anything wrong," according to Smith. The latter was actually describing an act that he did not deem to be negligent, but rather an inherent risk. And those risks "occur without negligence," according to the Supreme Court in *Felton*. So, the evidence cited by Nelson is not actually any evidence of Martinez breaching a pertinent standard of care when he initially inserted a screw into Nelson's spine that pierced through the pedicle. Thus, Nelson has not shown that the trial court erred in granting summary judgment on the claims that Martinez was negligent in inserting the screw as he did. This outcome leads us to examine whether the same is true about Martinez' alleged negligence in failing to discover the misplacement and correct it. In conducting that examination, we focus on the element of causation.

No one contests that the operation ultimately resulted in nerve damage. Indeed, Martinez admitted as much. The pivotal question, though, is when it occurred. Was its occurrence at the point of initial insertion or did it develop at some point later. If the former (as Martinez said), then it cannot be recompensed since it cannot logically be tied to negligent activity. To reiterate what we concluded above, Nelson failed to present evidence creating a genuine issue of fact regarding whether the "*initial*" insertion of the screw was negligent. Thus, the law would not permit compensation for injury proximately caused by that act.

On the other hand, if the injury arose from the failure to discover and timely correct the screw's placement, then it is possible that recovery may be had. The same

is true if injury had already occurred but the delay enhanced it. Indeed, the scenario is somewhat similar to that in *Brogan v. Brownlee*.

There, Brownlee, like Nelson, suffered damage to a nerve. The nerve damage resulted from a cardiac catheterization. The doctor performing the procedure happened to sew together the bottom and top of the artery through which it was conducted. *Brogan v. Brownlee*, 358 S.W.3d at 370. The question then before us concerned the point at which the nerve suffered permanent injury. *Id.* Brownlee had not claimed that sewing the artery walls together constituted negligence. Instead, her cause of action encompassed the doctor's failure to ameliorate the situation once "he gained information suggesting that something was wrong . . . ." *Id.* Given this, we observed that "Brownlee's recovery was dependent upon her establishing that Brogan's misfeasance (*i.e.* failure to reasonably respond. . .) caused at least some of the injury to her nerve." *Id.* at 371. "If her injury either pre-existed his delay or was not otherwise enhanced by it, there [could] be no causal link between the negligence and harm." *Id.* "Simply said, acts occurring at 6:30 [*i.e.*, the time at which the mishap was discovered] cannot, as a matter of law and logic, be said to have spawned injuries that arose before 6:30." *Id.* The same is no less true here.

To illustrate that he raised a fact question regarding the delay's effect on the resulting injury, Nelson cited us to the affidavits and deposition testimony of Zebala appearing in the clerk's record. Regarding the deposition, his citation consisted of a general (as opposed to a pinpoint) reference to approximately twenty-eight pages of deposition testimony. In them we found a brief discussion of what caused foot drop (*i.e.* injury to the nerve root), and, allegedly, how it can be remedied in certain situations (*i.e.*

11

altering the screw to decompress the nerve). Also within those pages appeared Zebala's statement that if the nerve in question were cut, then "that's it"; it cannot be remedied.[2]

He also imparted another bit of information within those pages. It concerned his answer to the question of whether he had "any scientific literature that supports [his] proposition, or any proposition, that had Dr. Martinez gone in and repositioned the screw after looking at the fluoroscopy images that [Zebala has] pointed out, that Mr. Nelson's foot drop would have been any different than what It is today." The answer was "No. You can't predict that. You're right." In other words, Zebala was acknowledging that once the nerve was damaged due to mal-positioning of the screw, he had no basis upon which to deduce that the damage was less than permanent.[3]

Another subject involved the method in which the screw affected the nerve after breaching the pedicle. According to the doctor, the screw can "cut the nerve root," go "directly through" the nerve, "stretch the nerve root or displace the nerve root," "cause hematoma around a nerve root that compresses the nerve root," or "it could be variable things . . . [v]arious things, I guess." Then, he admitted to having no opinion as to which of those methods, if any, caused Nelson's injury. This admission becomes important when compared to statements contained in his affidavit.

Yet, what we did not find within the general reference to the twenty-eight pages of Zebala's deposition was testimony discussing or explaining how or when the nerve

---

[2]Zebala conceded that medical literature he deemed reliable said 1) ". . . once a nerve root Injury has taken place, changing the direction of the screw does not alter the outcome," 2) ". . . once a change has occurred, there's no evidence to suggest that intraoperative maneuvers can lead to recovery of nerve function," and 3) "there is no evidence to suggest that neurophysiologic monitoring during lumbar spine fusion can alter the outcome of surgery."

[3] So, if it was damaged by the "initial" placement of the screw (as suggested by Martinez), the nerve could not recover, as acknowledged by Zebala.

was actually injured or how that injury progressed or was otherwise enhanced by the delay in discovering the mal-positioned screw.[4] So, the deposition excerpt was of little help, and we have no obligation to search the entirety of Zebala's deposition or the rest of the appellate record to see if the missing information may have appeared elsewhere. *See* TEX. R. APP. P. 38.1(i) (the appellant has the duty to cite to portions of the record that allegedly support his position); *Barnett v. Coppell N. Tex. Court, Ltd.*, 123 S.W.3d 804, 817 (Tex. App.—Dallas 2003, pet. denied) (stating that an appellate court has no duty to search a voluminous record without sufficient guidance from an appellant to determine whether an assertion of reversible error is valid).

As for the affidavits, they were relatively short documents. Yet, unlike the deposition, they contained information missing from the deposition excerpt. For instance, Zebala now attested that 1) "a direct nerve transection was unlikely, and this is not documented"; 2) "[i]t is more likely than not that the mechanism of injury was nerve compression by the pedicle screw"; 3) "[r]emoval of nerve pressure, if done urgently, could potentially lead to nerve recovery"; 4) "had [Martinez] immediately removed the screws and repositioned them laterally so that they were completely in the pedicle bone and directly visualized the screw to ensure there was *no residual nerve pressure or nerve transection*, Mr. Nelson's foot drop could have been avoided"; 5) "[i]t is also my opinion that the delay in diagnosis and surgery to decompress the nerve root caused Mr. Nelson's foot drop to be permanent"; 6) "[i]t is more likely than not that if the revision surgery had been performed on postoperative day one, Mr. Nelson could have

---

[4]Nelson does assert in his reply to Martinez' appellate brief that Zebala "states specifically how it occurred, i.e., the screw stretched the nerve or touched the nerve enough to cut off blood supply to the nerve." Yet, no record citation accompanied the assertion. Nor did we find in the twenty-eight pages of deposition testimony that they actually referenced such an opinion or explanation.

recovered to normal or near-normal function"; and, 7) "this delay in diagnosis and treatment directly attributed to Mr. Nelson's failure to have improvement of his foot drop." These passages, though, were not accompanied by explanation or allusion to evidence from which the opinions were derived. Nor did Nelson fill the void by citing us to aspects of the record which may have contained the data.

The foregoing absence of explanation or factual reference is troubling. This is so because Zabala's opinions about avoiding or minimizing nerve damage are obviously based on the proposition that the screw did not transect or cut the nerve. Instead, it only caused some type of undescribed compression. This tends to contradict his deposition statement that he had no opinion as to whether the screw stretched or displaced the nerve root, caused hematoma around the nerve to compress the root, or what. Now, via affidavit, he opined that compression was the mechanism of harm "since direct nerve transection was unlikely" and undocumented. Why is it "unlikely" . . . he did not say. Whether mere compression as opposed to transection *was documented* . . . he does not say. Whether other circumstances appeared in the medical or other pertinent records which permitted him to reasonably deduce that merely compression was involved . . . he did not say. Why it was not a displaced nerve root . . . he did not say. Why it was not any of the other "variable things" he mentioned . . . he did not say. Whether the lack of documentation simply reflected the possibility that no one knew of the exact interaction between the screw and nerve . . . he did not say.[5] It may well be

_____

[5]Of particular note is Zebala's opinion that if Dr. Martinez had correctly interpreted the fluoroscope after the pedicle screws had been inserted and had immediately removed the screws and repositioned them . . . and directly visualized the screw to ensure there was no residual nerve pressure *or nerve transection*, Mr. Nelson's foot drop could have been avoided." (Emphasis added). These words tend to indicate that transection may have occurred. At the very least, Zebala would have had Martinez check that. And, if Zebala was convinced that no transection occurred, as said in his affidavit, we find it curious that he would have Martinez look for it.

14

that his conclusion is founded on nothing more than speculation, and speculation is not evidence. *Fieldtech Avionics & Instr., Inc. v. Component Control.Com, Inc*, 262 S.W.3d 813, 833 (Tex. App.—Fort Worth 2008, no pet.). Neither Nelson nor Zebala afforded us any basis with which to make that assessment.

Similarly bereft of factual explanation or reference are his conclusions regarding the delay and its purported affect. First, we are told that if repositioning of the screw was "done urgently" or "immediately," then there could potentially have been nerve recovery or foot drop could have been "avoided." Such suggests that unless remediation occurred "urgently" or "immediately" damage would have resulted. What was meant by "urgently" or "immediately" . . . Zebala did not say. Why urgency or immediacy was required when compression was involved . . . he did not say. How a nerve is affected by initial and continuous compression . . . he did not say. Instead, we are simply left to accept that the unsupported conclusion that speedy remediation was needed to avoid harm.

On the other hand, the same physician opined that if Martinez had performed the surgery "on postoperative day one" (*i.e.* the day after the initial surgery as opposed to "immediately" upon reading the fluoroscope during or after surgery) then "Nelson could have recovered to normal or near-normal function." Why a one day delay (as opposed to immediate surgery) would have resulted in normal or near normal function . . . Zebala did not say. Why the time period that actually lapsed was too long . . . he did not say. The interrelationship between time and progressive injury . . . he did not explain. Instead, we are left to accept the conclusion that a one day delay may have been fine but not the lapse present here.

No doubt, appending the moniker expert to a witness may cause some to afford his opinions greater value when dealing in areas outside the realm of common knowledge. Yet, those opinions are not worthy of credence simply because they are voiced by an expert. To be admissible they must be relevant, reliable and based on a reliable foundation. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009) (stating that "[a]n expert witness may testify regarding scientific, technical, or other specialized matters if the expert is qualified, the expert's opinion is relevant, the opinion is reliable, and the opinion is based on a reliable foundation.") Furthermore, we are to rigorously examine the validity of facts and assumptions on which they are based. *Id.* And, if conclusory or speculative they then are irrelevant evidence. *Id.* That is what we have here with Zebala's conclusions. He mentioned no factual basis for them. Nor did Nelson cite us to anything of record illustrating their factual basis. Thus, they are conclusory and no evidence that the failure to timely discover and reposition the screw in the pedicle proximately caused the injury suffered by Nelson. So, the trial court did not err in granting summary judgment on the second claim of negligence propounded by Nelson.

Accordingly, we overrule the contention that some evidence supported each element of Nelson's various negligence claims, despite considering the evidence struck by the trial court. The judgment of the trial court is affirmed.


Brian Quinn
Chief Justice


16